UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| HOPKINS CHILD CARE CENTER LLC, CLOUD ACADEMY LLC, and ST. CLOUD CHILDCARE INC., | Civil File No. 26-cv-01495 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | |
| TIKKI BROWN, individually and in her official capacity; MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES; JOHN DOE 1-5, individually; and JANE DOE 1-5, individually; | |
| Defendants. | |

---

Plaintiffs submit the following as their First Amended Complaint in the above-entitled action:

## I.   INTRODUCTION

1. In the mid-1800s, a large number of Chinese immigrants came to the United States to find work in gold prospecting and railway construction. After the gold rush ended and the transcontinental railroad was completed, many such immigrants settled in West Coast cities such as San Francisco. Chinese immigrants faced widespread discrimination, however, and found it difficult to obtain employment from established businesses. As a result, entrepreneurial and ambitious Chinese immigrants often gravitated towards self-employment, notably including businesses providing laundry services to members of the public, since in-home laundry facilities were rare at the time. Because of this, the stereotype of the "Chinese laundry" persisted at least into the 1970s, including the well-known Calgon television commercial touting its "ancient Chinese secret." *See* https://www.youtube.com/watch?v=djMjYgqFrrQ.

2. In 1880, the city of San Francisco passed ordinances requiring that all public laundries obtain a permit from the city board of supervisors, unless the laundry was located in a building constructed of brick or stone. The purported purpose of the ordinances was to guard against fires by requiring that laundries in wood buildings be inspected for fire safety before a permit would be granted.

3. In 1880, there were 320 public laundries in San Francisco, 310 of which were constructed of wood and 240 of which were owned by persons of Chinese descent. Of the 240 laundry owners of Chinese descent, 150 were arrested, cited, and fined under the ordinance between 1880 and 1885. Of the 80 non-Chinese laundry owners, none were arrested, cited, or fined.

4. A Chinese laundry owner, Yick Wo, contested his citation all the way to the United States Supreme Court, which ruled that the Government's selective enforcement of a facially neutral law based on race or ethnicity violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.").

5. Yick Wo's experience of being forced by societal discrimination into an industry where his ethnicity is disproportionately prevalent is not unique in American history. Indeed, to this day, the infamous New York history of "no Irish need apply" signs exists alongside the persistent prevalence of police officers of Irish descent in the New York Police Department. Similarly, Yick Wo's experience of being targeted for selective enforcement based on his ethnicity

persists in the disproportionate prevalence of African-American men among those subjected to "stop and frisk" detentions in New York City. *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153, 166 (S.D.N.Y. 2012) (noting expert analysis of 2.8-million-strong database of stop-and-frisk detentions finding that the policy "unlawfully target[ed] Blacks and Latinos for stops, summonses, arrests, and excessive force").

6. This case arises from the latest flashpoint in this unfortunate historical pattern. In late December 2025, Plaintiffs were targeted by an ersatz posse led by an internet troll who accused them of engaging in fraudulent billing of the federal Child Care Assistance Program (CCAP), based solely on their Somali ancestry, and published his "findings" in an internet video that was ultimately viewed by millions. After the President of the United States endorsed the troll and condemned all Somalis in Minnesota as "garbage," Defendants adopted the troll's ethnically based presumption that Somali daycares are uniquely likely to be engaged in fraud and selectively targeted Plaintiffs for investigations, imposing indefinite suspensions of Plaintiffs' access to CCAP funds that ensure that Plaintiffs' businesses will fail based on allegations that no reasonable person would find credible and which Plaintiffs have no reasonable opportunity to rebut. Plaintiffs and many others in the Somali-American community were also targeted for death threats in hundreds of voicemails and text messages.

## II. PARTIES

7. Plaintiff HOPKINS CHILD CARE CENTER LLC (HCCC) is a Minnesota limited-liability corporation doing business as a licensed childcare center in Hennepin County, Minnesota.

8. Plaintiff CLOUD ACADEMY LLC (CLOUD) is a Minnesota limited-liability corporation doing business as a licensed childcare center in Stearns County, Minnesota.

9. Plaintiff ST. CLOUD CHILDCARE INC. (SCC) is a Minnesota corporation doing business as a licensed childcare center in Benton County, Minnesota.

10. Defendant TIKKI BROWN is the Commissioner of the MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, and is sued in both her individual and official capacity.

11. Defendant MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES (DCYF) is an administrative agency of the State of Minnesota.

12. JOHN DOE 1-5 and JANE DOE 1-5 are employees of DCYF or other Minnesota state agencies and are sued in their individual capacities.

13. BROWN, JOHN DOE 1-5, and JANE DOE 1-5 are referred to collectively as Individual Defendants.

### III.   JURISDICTION AND VENUE

14. This Court has jurisdiction under 28 U.S.C. §§ 2201, 1331, 1343, 1367, and 1441(a) and under *Ex Parte Young*, 28 S. Ct. 441, 209 U.S. 123 (1908).

15. This Court has supplemental jurisdiction over Plaintiffs' state-law claims because those claims are part of the same case or controversy that forms the basis for the Plaintiffs' federal claims.

16. The United States District Court for the District of Minnesota is the appropriate venue for removal under 28 U.S.C. § 1441(a) because it is the federal district encompassing Ramsey County District Court, where this suit was originally filed, which was the appropriate venue under Minn. Stat. § 542.09 because Defendants DHS and DCYF are located in Ramsey County.

## IV.     FACTUAL BACKGROUND

1. Plaintiffs are business entities operating childcare centers licensed by DCYF and each has a contract with the State of Minnesota for CCAP reimbursement.

2. Under the federally funded Child Care Assistance Program (CCAP), parents who meet certain eligibility criteria can obtain financial assistance for childcare services. After receiving CCAP approval from county caseworkers, such parents can engage the services of any licensed childcare provider that agrees to accept CCAP reimbursement.

3. Childcare providers accepting CCAP must maintain DCYF licensure and must also comply with CCAP billing and reporting requirements, which are enforced by DCYF. Prior to the establishment of DCYF, however, these requirements were enforced by DHS and many of the policies, procedures, assessment tools, and criteria used by DCYF were developed by DHS. On information and belief, DHS also continues to be involved in providing investigative support to DCYF in CCAP-related fraud investigations.

4. In December 2025, an internet troll named Nick Shirley with a history of racially prejudiced and anti-Muslim posts conducted a series of ambush interviews targeting Minnesota childcare centers owned by persons of Somali decent, including Plaintiffs. Shirley claimed the interviews were "investigations" and Shirley claimed that the targeted childcare centers were fraudulent based on their refusals to allow Shirley inside to view the children.

5. The Shirley videos were misleading in numerous ways, including Shirley's visiting of some of the targeted childcare centers outside of their operating hours, Shirley's ignorance of the structure of the CCAP program, and Shirley's ignorance of the laws and regulations governing childcare operations in Minnesota. Simply put, Shirley's "fraud theory" of daycares devoid of children was not only inaccurate, it was impossible because of the structure of the CCAP program.

6. Despite its misleading content, Shirley's video was promoted by state and federal officials and other political figures seeking to score political points. Many of these endorsements specifically and openly promoted ethnic prejudice by explicitly linking Shirley's fraud allegations to the Somali community in Minnesota. For example, Minnesota congressional Representative Tom Emmer called for all Somali citizens associated with fraud to be denaturalized and the President of the United States categorically referred to members of the Somali community in Minnesota as "garbage."

7. Shirley's video was widely published and viewed by millions of people. As a result of its inflammatory content and the anti-Somali context surrounding it, many members of the Somali community in Minnesota, including several of the Individual Plaintiffs, received numerous threatening communications—including dozens of death threats. Daycares targeted by Shirley, including Plaintiffs, were also targeted by copycats inspired by Shirley's video, sowing widespread fear among both daycare operators and the parents of children in the daycares.

8. Defendants were initially cognizant of the obvious defects in and the horrific effects of Shirley's propaganda. For example, on December 29, 2025, BROWN held a press conference where she stated that "all of the daycares featured in Shirley's video had been the subject of unannounced visits in the past six months" and that "while the day care centers have been subject to past investigations, *the state had found no evidence of fraud*." Howard Thompson, *YouTuber Nick Chirley Returns to Minneapolis Day Care After Viral Fraud Video*, Fox 9 News, Dec. 30, 2025, https://www.fox9.com/news/youtuber-nick-shirley-returns-minneapolis-day-care-after-viral-fraud-video (emphasis added).

9. On December 30, 2025, the federal Department of Health and Human Services (HHS) announced that it was cutting off all CCAP funds to Minnesota pending a new federally

6

mandated "audit" of fraud in Minnesota. In the announcement, the HHS official noted that he had spoken directly with "the Director of Minnesota's child care services office" regarding the fraud allegations. *See* Associated Press, *Trump Administration Say's It's Freezing Child Care Funds to Minnesota*, NPR News, Dec. 30, 2025, https://www.npr.org/2025/12/30/g-s1-104049/trump-minnesota-child-care-funding-freeze-fraud-schemes.

10. On information and belief, the person referred to by the HHS official was an employee of DCYF.

11. The federal government also initiated a massive and militarized pressure campaign in Minnesota, including deployment of purported fraud investigators from Homeland Security Investigations (HSI), a component of the federal Department of Homeland Security, and a purported "surge" of investigators from the Federal Bureau of Investigation (FBI), a component of the federal Department of Justice (DOJ). The Immigration and Customs Enforcement (ICE) agency, a component of the federal Department of Homeland Security, also initiated a highly militarized immigration enforcement campaign targeting, among others, persons of Somali descent in Minnesota.

12. Combined with Defendants's actual and constructive knowledge of the flaws in Shirley's "fraud theory," the statements from federal political officials referenced above in paragraph 6 put DHS on notice that the federal government's basis for investigating and for demanding that DCYF investigate purported CCAP fraud in Minnesota acting arose from bias against Somalis and not from any good-faith effort to identify potential sources of fraud among Minnesota daycare providers receiving CCAP funds.

13. Defendants responded to the federal pressure campaign with an effort at appeasement, specifically targeting daycares operated by persons of Somali descent, including

7

Plaintiffs, with bad-faith fraud allegations in an effort to appease the federal government. Specifically, Defendants directed DCYF investigators to conduct special visits to many daycares owned by persons of Somali descent outside of the usual annual or semi-annual schedules for such visits for the purpose of obtaining attendance records to assess for potential fraud. On information and belief, no non-Somali-owned childcare centers were targeted for such special visits.

14. Pursuant to DCYF's ethnically targeted campaign of appeasement, Plaintiffs HOPKINS CCC and CLOUD received notices of "temporary" suspension from the CCAP program. The notices stated that DCYF had received "credible allegations" of fraud and stated that HOPKINS CCC and CLOUD were permitted to provide information to DCYF on why the payment suspensions should not continue. But rather than specifying the nature of any fraud allegations, the notices contained only general language about the many types of fraud that can theoretically be found in daycare operations.

15. The initial notices received by HOPKINS CCC and CLOUD were also internally self-contradictory, stating that the CCAP suspensions were a temporary measure pursuant to an ongoing investigation but also including language indicating that DCYF had already reached a final determination of an appropriate sanction. This language indicated that DCYF was not, in fact, pursuing a good-faith investigation but was instead engaging in a sham investigation designed to justify a predetermined conclusion that HOPKINS CCC and CLOUD had engaged in fraud while using the purportedly "temporary" CCAP suspension—which is not subject to administrative or judicial appeal under Minnesota law—as a tool for imposing an *indefinite* CCAP suspension while denying HOPKINS CCC and CLOUD any opportunity for judicial review. DCYF ignored emails from counsel for HOPKINS CCC and CLOUD seeking clarification of the internally contradictory language in the initial CCAP suspension notices.

16.     After this suit was originally filed in Minnesota state court, HOPKINS CCC and CLOUD received "amended" CCAP suspension notices. The amended notice to HOPKINS CCC claimed that a Minnesota Department of Human Services Office of Inspector General[1] surveillance operation HOPKINS CCC had overbilled CCAP in March and April of 2023, nearly three years before DCYF sent the initial CCAP suspension notice to HOPKINS CCC in the aftermath of the Shirley video.

17.     The gap in time between the purported surveillance operation and the issuance of the CCAP suspension notice to HOPKINS CCC combined with the fact that the 2023 allegations were only made specific *after* HOPKINS CCC pointed out the vagueness of DCYF's initial allegations justifies the inference that the 2023 allegations are pretextual and that the true purpose of the CCAP suspension notices issued to HOPKINS CCC was for DCYF to be seen targeting Somali-owned childcare centers in the hopes of appeasing the federal government.

18.     Similarly, the amended notice to CLOUD claimed that a DHS OIG surveillance operation had exposed overbilling from January through March 2025, nearly a full year before DCYF sent the initial CCAP suspension notice to CLOUD in the aftermath of the Shirley video.

19.     On information and belief, the purported "credible allegations" of fraud against Plaintiffs HOPKINS CCC and CLOUD cited in the initial CCAP suspension notices in fact reflected Defendants' decision to simply accept the allegations in Shirley's video as "credible" so that Defendants could attempt to appease the federal government by "throwing Plaintiffs under the bus" and did not reflect any objective or good-faith investigation of Plaintiffs' childcare operations.

---

[1] DCYF is a successor agency to the Minnesota Department of Human Services' oversight of the CCAP program in Minnesota.

20. The gap in time between the purported surveillance operation and the issuance of the CCAP suspension notice to CLOUD combined with the fact that the 2025 allegations were only made specific *after* CLOUD pointed out the vagueness of DCYF's initial allegations also justifies the inference that the 2025 allegations are pretextual and that the true purpose of the CCAP suspension notices issued to CLOUD was for DCYF to be seen targeting Somali-owned childcare centers in the hopes of appeasing the federal government.

21. The timing of the amended notices to HOPKINS CCC and CLOUD also justifies the inference that DCYF sought *ex post facto* to identify any available justification for its initial notices in the hopes that it would provide a defense against the present litigation.

22. The amended notices to HOPKINS CCC and CLOUD also continued to contain the internally contradictory language indicating that there was nothing temporary or provisional about DCYF's fraud determination because DCYF had already selected "the appropriate sanction."

23. Plaintiff SCCC also received a CCAP payment suspension notice, stating that DCYF investigators had determined that there were both "credible allegations" of fraud and that there was a "preponderance of evidence" of fraud based solely on DCYF's inference drawn from its observation that several sign-in sheets used by SCCC for taking attendance appeared to be in the same person's handwriting.

24. Like the internally contradictory language in the notices to HOPKINS CCC and CLOUD, the internally contradictory language in the notice sent to SCCC was not really a temporary withholding pursuant to an ongoing good-faith investigation, but was instead a tool used by DCYF to engage in a sham investigation designed to justify a predetermined conclusion that SCCC had engaged in fraud while using the purportedly "temporary" CCAP suspension—which is not subject to administrative or judicial appeal under Minnesota law—as a tool for imposing an

*indefinite* CCAP suspension while denying SCCC any opportunity for judicial review. DCYF ignored email from counsel for SCCC seeking clarification of the internally contradictory language in the CCAP suspension notices.

25. Substantively, the allegation against SCCC, while specific, did not reflect a good-faith determination of potential fraud because DCYF made no effort to determine *why* some or many or even all of the attendance sheets might reflect the same person's handwriting nor did DCYF make any effort to determine or explain *how* such a situation could constitute fraud. Instead, DCYF simply used the purported irregularity to *presume* fraud in order to meet its goal of trying to pander to the federal government's openly expressed bias against Somalis.

26. Had DCYF conducted even minimal investigation regarding the handwriting on the SCCC attendance sheets, it would have discovered that it resulted from an effort by SCCC to guard against errors made by parents—many of whom have very limited English reading and writing ability—in attendance sign-in sheets, in specific reaction to DCYF policies holding CCAP providers solely responsible for all errors made by parents on attendance records. But DCYF did not make any such inquiry before issuing the CCAP suspension notice to SCCC, even though Minnesota law defines a "credible allegation of fraud" to include a requirement that any allegation be verified by the DCYF commissioner.

27. Although all of CCAP the notices stated that their recipients were permitted to provide information to DCYF on why the payment suspension should not be continued, the notices did not allow Plaintiffs any mechanism to obtain any independent review—judicial or otherwise—of the factual basis for their issuance or DCYF's purported credibility determination. As such, the notices left Plaintiffs with no recourse to rebut the allegations made against them, protect the ability

11

of their businesses to operate, or to defend their reputations against an intense and ongoing assault from powerful political forces motivated by racial animus.

## V. CLAIMS FOR RELIEF

### A. COUNT ONE: SELECTIVE DISCRIMINATORY ENFORCEMENT—42 U.S.C. § 1983 (BY ALL PLAINTIFFS AGAINST INDIVIDUAL DEFENDANTS)

28. Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

29. Defendants' decision to respond to the allegations of fraud among CCAP recipients by conducting special investigations *exclusively* at childcare centers believed to be owned by persons of Somali descent constituted selective discriminatory enforcement, in violation of Plaintiffs' constitutional rights under the Equal Protection Clause of the United States Constitution.

30. Defendants acted under color of state law, rendering their conduct actionable under 42 U.S.C. § 1983.

31. Defendants' selective targeting of Plaintiffs for special investigations and/or CCAP suspensions due to their racial and/or ethnic identity resulted in financial losses to Plaintiffs, justifying an award of damages over $50,000 and in an exact amount to be proven at trial.

32. Plaintiffs also suffered extreme mental anguish and harm as a result of Defendants' willing and intentional participation in a program of racial and/or ethnic discrimination that included receipt of hundreds of death threats and substantially added to a broader environment of extreme fear among members of Minnesota's Somali community, justifying an additional award of damages over $50,000 and in an exact amount to be proven at trial.

33. Plaintiffs are also entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

**B.     COUNT TWO: VIOLATION OF PROCEDURAL DUE PROCESS—42 U.S.C. § 1983 (BY ALL PLAINTIFFS AGAINST INDIVIDUAL DEFENDANTS)**

34.     Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

35.     Defendants' notices of CCAP suspension to HOPKINS CCC and CLOUD failed to provide sufficient specification of the purported fraud allegations to allow HOPKINS CCC and CLOUD any meaningful notice of the specific allegations against them or provide any meaningful response to DCYF in response.  This violated HOPKINS CCC's and CLOUD's procedural due process rights under the United States Constitution.

36.     Defendants' initial notices of CCAP suspension to HOPKINS CCC and CLOUD failed to provide sufficient specification of the purported fraud allegations to allow HOPKINS CCC and CLOUD any meaningful notice of the specific allegations against them or provide any meaningful response to DCYF in response.  This violated HOPKINS CCC's and CLOUD's procedural due process rights under the United States Constitution.

37.     Defendants' notice to SCCC relied on an investigation that was willfully deficient and devoid of even basic efforts to verify the allegations by inquiry into readily available information.  This violated SCCC's procedural due process rights under the United States Constitution.

38.     Defendants acted under color of state law, rendering their conduct actionable under 42 U.S.C. § 1983.

39.     Plaintiffs are therefore entitled to an award of nominal damages and an award of attorney's fees under 42 U.S.C. § 1988(b).

C.    **COUNT THREE: DECLARATORY/INJUNCTIVE/MANDAMUS RELIEF UNDER STATE LAW (BY ALL PLAINTIFFS AGAINST DCYF)**

40.    Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

41.    Defendants' denials of due process also entitle HOPKINS CCC and CLOUD to a declaratory judgment under Minnesota's Declaratory Judgment Act that the use of generalized language in the initial CCAP suspension notices violated due process, and an injunction barring DCYF from using such generalized language as a basis for any CCAP suspension.

42.    Defendants' denial of due process also entitle SCCC to declaratory judgment under Minnesota's Declaratory Judgment Act that DCYF's investigation into the purported "credible allegation of fraud" was insufficient as a matter of law, in violation of constitutional due process, and an injunction requiring that DCYF verify its "fraud theories" by reasonable inquiry into potentially exculpatory information that may be readily available to investigators before issuing CCAP suspension notices.

43.    Plaintiffs are also entitled to an alternative writ of mandamus under Minnesota Statutes section 555 compelling Defendants to rescind the CCAP payment suspensions.

44.    Plaintiffs are also entitled to recovery of their attorney's fees under Minn. Stat. § 555.08.

D.    **COUNT FOUR: DECLARATORY/INJUNCTIVE/MANDAMUS RELIEF UNDER STATE LAW AS TO HANDWRITING-BASED FRAUD THEORY (BY SCCC ONLY AGAINST DCYF)**

45.    SCCC reasserts the allegations in the paragraphs above as if fully set forth here.

46. Defendants' determination that the apparent use of one person's handwriting on attendance sheets at SCCC, even if true, cannot support a fraud determination as a matter of law because Defendants cannot identify a specific statute or rule that prohibits CCAP reimbursement in such a situation and, therefore, cannot show that any receipt of CCAP reimbursement based on such attendance records involved SCCC's obtaining "the property of another" as would be required for any fraud determination under Minnesota law. *See Matter of SIRS Appeal by Best Care, LLC*, 26 N.W.3d 459, 473 (Minn. 2025) (holding that determination of an "overpayment" from government programs requires the state agency to identify a specific statute or regulation that would specifically prohibit payment because of the purported violation).

47. SCCC is therefore entitled to declaratory judgment that Defendants' allegation regarding handwriting usage on sign-in sheets is insufficient as a matter of law to support a CCAP payment suspension and an injunction barring Defendants from enforcing any CCAP suspension on such grounds in the future.

48. SCCC is also entitled to an alternative writ of mandamus compelling Defendants to rescind the CCAP payment suspension and an award of damages in excess of $50,000 and in an exact amount to be proven at trial.

49. Because Defendants' conduct constitutes violations of "the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade," *see* Minn. Stat. § 8.31, subd. 1, SCCC also entitled to an award of attorney's fees, costs of investigation, and costs and disbursements under Minn. Stat. § 8.31, subd. 3a.

50. Because Defendants' attempts to appease bigots by "throwing SCCC under the bus" constitutes both vexatious conduct and oppressive reasons, SCCC is also entitled to an award of attorney's fees under "the exception to [the general rule against award of attorney's fees without

statutory authorization] in cases where the unsuccessful party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Fownes v. Hubbard Broadcasting, Inc.*, 246 N.W.2d 700, 702 (Minn. 1976) (quotation omitted).

51. SCCC is also entitled to recovery of its attorney's fees under Minn. Stat. § 555.08.

52. SCCC asserts this claim under state law and initiated action in state court. Defendants have waived any Eleventh Amendment or sovereign immunity defenses by removing this matter to federal court.

### E. COUNT FIVE: BREACH OF CONTRACT UNDER STATE LAW (BY ALL PLAINTIFFS AGAINST DCYF)

53. Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

54. Plaintiffs and DCYF had a contractual relationship, a material term of which was the implied covenant of good faith and fair dealing which required DCYF to refrain from unjustifiably hindering each Plaintiffs' ability to perform under the contract.

55. By accepting Shirley's allegations as credible in spite of their glaring factual defects and obvious bigoted basis, and by using those allegations as the basis to target Plaintiffs for CCAP suspension notices that effectively put Plaintiffs out of business, DCYF breached the implied covenant of good faith and fair dealing.

56. DCYF also breached the implied covenant of good faith and fair dealing by targeting Plaintiffs for special investigations based on Plaintiff's perceived and/or imputed racial/ethnic identity.

57. As a result of DCYF's breach, each Plaintiff is entitled to an award of damages in an amount over $50,000 and in an exact amount to be proven at trial.

58. Plaintiffs assert this claim under state law and initiated action in state court. Defendants have waived any Eleventh Amendment or sovereign immunity defenses by removing this matter to federal court.

### VI.    PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court:

(1)    Award each Plaintiff actual, consequential, compensatory, and special damages over $50,000 and in an exact amount to be proven at trial;

(2)    Declare that DCYF's notices to CLOUD and HOPKINS CCC violated due process;

(3)    Declare that DCYF's deficient investigation of its allegations against SCCC violated due process;

(4)    Permanently enjoin DCYF from relying on general, nonspecific language in CCAP suspension notices;

(5)    Permanently enjoin DCYF from issuing CCAP suspension notices without attempting to access readily available exculpatory information;

(6)    Declare that DCYF's basis for its notice to SCCC, even if true, could not support a credible allegation of fraud as a matter of law;

(7)    Permanently enjoin DCYF from relying on any basis substantively similar to that used in future CCAP suspension notices;

(8)    Issue an alternative writ of mandamus compelling DCYF to rescind the CCAP suspension notices against Plaintiffs;

(9)    Award each Plaintiff its attorney's fees under 42 U.S.C. § 1888(b) and Minn. Stat. 555.08;

(10) Award Plaintiff taxable costs and disbursements incurred in this action as permitted under state law.

(11) Award Plaintiffs prejudgment and postjudgment interest at the highest lawful rates permitted under state law.

(12) Award Plaintiffs such further relief as Plaintiffs may be entitled and which the Court deems just and proper.

Dated:   2/19/2026                         /s/ Jason Steck
                                           Jason Steck #0393077
                                           Attorney for Plaintiffs
                                           6160 Summit Drive North, Suite 220
                                           Brooklyn Center, MN 55430
                                           jason@jasonstecklaw.com
                                           (763) 402-1829

The undersigned hereby acknowledges that sanctions may by imposed under the circumstances set forth in Minn. Stat. § 549.211.

                                           /s/ Jason Steck
                                           Jason Steck (#0393077)