UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

HOPKINS CHILD CARE CENTER LLC,
CLOUD ACADEMY LLC,
ST. CLOUD CHILDCARE INC., and
ZAMZAM DAYCARE LLC;

Civil File No. 26-cv-01495

Plaintiffs,

v.

**SECOND AMENDED COMPLAINT**

TIKKI BROWN, individually and in her official capacity;
MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES;
JOHN DOE 1-5, individually; and
JANE DOE 1-5, individually;

Defendants.

Plaintiffs submit the following as their Second Amended Complaint in the above-entitled action:

## I.      INTRODUCTION

1.      In the mid-1800s, a large number of Chinese immigrants came to the United States to find work in gold prospecting and railway construction.  After the gold rush ended and the transcontinental railroad was completed, many such immigrants settled in West Coast cities such as San Francisco.  Chinese immigrants faced widespread discrimination, however, and found it difficult to obtain employment from established businesses.  As a result, entrepreneurial and ambitious Chinese immigrants often gravitated towards self-employment, notably including businesses providing laundry services to members of the public, since in-home laundry facilities were rare at the time.  Because of this, the stereotype of the "Chinese laundry" persisted at least into the 1970s, including the well-known Calgon television commercial touting its "ancient Chinese secret."  *See* https://www.youtube.com/watch?v=djMjYgqFrrQ.

2.    In 1880, the city of San Francisco passed ordinances requiring that all public laundries obtain a permit from the city board of supervisors, unless the laundry was located in a building constructed of brick or stone.  The purported purpose of the ordinances was to guard against fires by requiring that laundries in wood buildings be inspected for fire safety before a permit would be granted.

3.    In 1880, there were 320 public laundries in San Francisco, 310 of which were constructed of wood and 240 of which were owned by persons of Chinese descent.  Of the 240 laundry owners of Chinese descent, 150 were arrested, cited, and fined under the ordinance between 1880 and 1885.  Of the 80 non-Chinese laundry owners, none were arrested, cited, or fined.

4.    A Chinese laundry owner, Yick Wo, contested his citation all the way to the United States Supreme Court, which ruled that the Government's selective enforcement of a facially neutral law based on race or ethnicity violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.  *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.").

5.    Yick Wo's experience of being forced by societal discrimination into an industry where his ethnicity is disproportionately prevalent is not unique in American history.  Indeed, to this day, the infamous New York history of "no Irish need apply" signs exists alongside the persistent prevalence of police officers of Irish descent in the New York Police Department.  Similarly, Yick Wo's experience of being targeted for selective enforcement based on his ethnicity

persists in the disproportionate prevalence of African-American men among those subjected to "stop and frisk" detentions in New York City.  *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153, 166 (S.D.N.Y. 2012) (noting expert analysis of 2.8-million-strong database of stop-and-frisk detentions finding that the policy "unlawfully target[ed] Blacks and Latinos for stops, summonses, arrests, and excessive force").

6.      This case arises from the latest flashpoint in this unfortunate historical pattern.  In late December 2025, Plaintiffs were targeted by an ersatz posse led by an internet troll who accused them of engaging in fraudulent billing of the federal Child Care Assistance Program (CCAP), based solely on their Somali ancestry, and published his "findings" in an internet video that was ultimately viewed by millions.  After the President of the United States endorsed the troll and condemned all Somalis in Minnesota as "garbage," Defendants adopted the troll's ethnically based presumption that Somali daycares are uniquely likely to be engaged in fraud and selectively targeted Plaintiffs for investigations, imposing indefinite suspensions of Plaintiffs' access to CCAP funds that ensure that Plaintiffs' businesses will fail based on allegations that no reasonable person would find credible and which Plaintiffs have no reasonable opportunity to rebut.  Plaintiffs and many others in the Somali-American community were also targeted for death threats in hundreds of voicemails and text messages.

## II.      PARTIES

7.      Plaintiff HOPKINS CHILD CARE CENTER LLC (HOPKINS CCC) is a Minnesota limited-liability corporation doing business as a licensed childcare center in Hennepin County, Minnesota.

8.      Plaintiff CLOUD ACADEMY LLC (CLOUD) is a Minnesota limited-liability corporation doing business as a licensed childcare center in Stearns County, Minnesota.

3

9. Plaintiff ST. CLOUD CHILDCARE INC. (SCC) is a Minnesota corporation doing business as a licensed childcare center in Benton County, Minnesota.

10. Plaintiff ZAMZAM DAYCARE LLC (ZAMZAM) is a Minnesota limited-liability corporation doing business as a family childcare facility in Dakota County, Minnesota.

11. Each Plaintiff is owned by persons of Somali or other East African descent.

12. Defendant TIKKI BROWN is the Commissioner of the MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, and is sued in both her individual and official capacity.

13. Defendant MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES (DCYF) is an administrative agency of the State of Minnesota.

14. JOHN DOE 1-5 and JANE DOE 1-5 are employees of DCYF or other Minnesota state agencies and are sued in their individual capacities.

15. BROWN, JOHN DOE 1-5, and JANE DOE 1-5 are referred to collectively as Individual Defendants.

### III.   JURISDICTION AND VENUE

16. This Court has jurisdiction under 28 U.S.C. §§ 2201, 1331, 1343, 1367, and 1441(a) and under *Ex Parte Young*, 28 S. Ct. 441, 209 U.S. 123 (1908).

17. This Court has supplemental jurisdiction over Plaintiffs' state-law claims because those claims are part of the same case or controversy that forms the basis for the Plaintiffs' federal claims.

18. The United States District Court for the District of Minnesota is the appropriate venue for removal under 28 U.S.C. § 1441(a) because it is the federal district encompassing Ramsey County District Court, where this suit was originally filed, which was the appropriate

venue under Minn. Stat. § 542.09 because Defendants DHS and DCYF are located in Ramsey County.

**IV.   FACTUAL BACKGROUND**

1.      Plaintiffs are business entities operating childcare facilities licensed by DCYF and each has a contract with the State of Minnesota for CCAP reimbursement.

2.      Under the federally funded Child Care Assistance Program (CCAP), parents who meet certain eligibility criteria can obtain financial assistance for childcare services.  After receiving CCAP approval from county caseworkers, such parents can engage the services of any licensed childcare provider that agrees to accept CCAP reimbursement.

3.      Childcare providers accepting CCAP must maintain DCYF licensure and must also comply with CCAP billing and reporting requirements, which are enforced by DCYF.  Prior to the establishment of DCYF, however, these requirements were enforced by DHS and many of the policies, procedures, assessment tools, and criteria used by DCYF were developed by DHS.  On information and belief, DHS also continues to be involved in providing investigative support to DCYF in CCAP-related fraud investigations.

4.      DCYF and DHS have historically demonstrated a stark pattern of ethnically targeting Somali-owned child-care providers for investigations.  On information and belief, Somali-owned child-care providers have been targeted for investigations in numbers grossly disproportionate to their representation among child-care providers in Minnesota since at least 2017, when Somali-owned daycare facilities were selectively targeted by investigators alleging rampant fraud.  *See* Ibrahim Hirsi, *How a New Group Is Trying to Counter Negative Perceptions About Somali-American Day Cares in Minnesota*, MinnPost, June 30, 2017.

5.      DHS has been historically associated with those targeting ethnic Somalis for purported criminal activity.  In 2019, for example, former DHS official accused Somali child-care providers of funneling money to terrorist groups, resulting in a report from Minnesota's legislative auditor that found no evidence to support the claims.  *See* John Bowden, *Minnesota Probe Finds No Evidence Day Care Fraud Was Funneling Money to Terrorists*, The Hill, March 3, 2019.

6.      Defendants' stark pattern of selective enforcement against Somali providers also extends to child-care licensing matters, where, upon information and belief, Somali providers are much more likely to face severe licensing sanctions for alleged violations than child-care providers of other ancestry.

7.      In December 2025, an internet troll named Nick Shirley with a history of racially prejudiced and anti-Muslim content conducted a series of ambush interviews targeting Minnesota childcare centers owned by persons of Somali decent, including.  Shirley claimed the interviews were "investigations" and that the targeted childcare centers were fraudulent based on their refusals to allow Shirley inside to view the children.

8.      The Shirley videos were misleading in numerous ways, including Shirley's visiting of some of the targeted childcare centers outside of their operating hours, Shirley's ignorance of the structure of the CCAP program, and Shirley's ignorance of the laws and regulations governing childcare operations in Minnesota.  Simply put, Shirley's "fraud theory" of daycares devoid of children was not only inaccurate, it was impossible because of the structure of the CCAP program.

9.      Despite its misleading content, Shirley's video was promoted by state and federal officials, other political figures, and some media personalities seeking to score political points. Many of these endorsements specifically and openly promoted ethnic prejudice by explicitly linking Shirley's fraud allegations to the Somali community in Minnesota.  For example,

Minnesota congressional Representative Tom Emmer called for all Somali citizens associated with fraud to be denaturalized and the President of the United States categorically referred to members of the Somali community in Minnesota as "garbage."

10.     Shirley's video was widely published and viewed by millions of people.  As a result of its inflammatory content and the anti-Somali context surrounding it, many members of the Somali community in Minnesota, including some of the owners and employees of Plaintiffs, received numerous threatening communications—including dozens of death threats.  Daycares targeted by Shirley, HOPKINS CCC, CLOUD, and SCC, were also targeted by copycats inspired by Shirley's video, sowing widespread fear among both daycare operators and the parents of children in the daycares.

11.     Defendants were initially cognizant of the obvious defects in Shirley's propaganda video.  For example, on December 29, 2025, BROWN held a press conference where she stated that "all of the daycares featured in Shirley's video had been the subject of unannounced visits in the past six months" and that "while the day care centers have been subject to past investigations, *the state had found no evidence of fraud*."  Howard Thompson, *YouTuber Nick Chirley Returns to Minneapolis Day Care After Viral Fraud Video*, Fox 9 News, Dec. 30, 2025, https://www.fox9.com/news/youtuber-nick-shirley-returns-minneapolis-day-care-after-viral-fraud-video (emphasis added).

12.     On December 30, 2025, the federal Department of Health and Human Services (HHS) announced that it was cutting off all CCAP funds to Minnesota pending a new federally mandated "audit" of fraud in Minnesota.  In the announcement, the HHS official noted that he had spoken directly with "the Director of Minnesota's child care services office" regarding the fraud allegations.  *See* Associated Press, *Trump Administration Say's It's Freezing Child Care Funds to*

7

*Minnesota*, NPR News, Dec. 30, 2025, https://www.npr.org/2025/12/30/g-s1-104049/trump-minnesota-child-care-funding-freeze-fraud-schemes.

13.    On information and belief, the person referred to by the HHS official was an employee of DCYF.

14.    The federal government also initiated a massive and militarized pressure campaign in Minnesota, including deployment of purported fraud investigators from Homeland Security Investigations (HSI), a component of the federal Department of Homeland Security, and a purported "surge" of investigators from the Federal Bureau of Investigation (FBI), a component of the federal Department of Justice (DOJ).  The Immigration and Customs Enforcement (ICE) agency, a component of the federal Department of Homeland Security, also initiated a highly militarized immigration enforcement campaign targeting, among others, persons of Somali descent in Minnesota.

15.    Combined with Defendants' actual and constructive knowledge of the flaws in Shirley's "fraud theory," the statements from federal political officials referenced above in paragraph 6 put DHS on notice that the federal government's basis for investigating and for demanding that DCYF investigate purported CCAP fraud in Minnesota arose from bias against Somalis and not from any good-faith effort to identify potential sources of fraud among Minnesota daycare providers receiving CCAP funds.

16.    Defendants responded to the federal pressure campaign with an effort at appeasement, specifically targeting daycare facilities operated by persons of Somali descent, including Plaintiffs, with vague, bad-faith fraud allegations in an effort to appease the federal government by conducting sham investigations focused on the same Somali targets that Shirley and the federal government had claimed were responsible for fraud among Minnesota daycares.

17.     On information and belief, Defendants thus not only adopted the racial premise of Shirley's videos to target Shirley's targets but expanded their adoption of Shirley's and the federal government's allegations to include Shirley's repeated inferences that daycare fraud in Minnesota was uniquely and particularly a Somali or East African problem.  As a result, Defendants focused their reactions almost entirely on daycares operated by, or perceived to be operated by, persons of Somali or East African descent.

18.     Specifically, Defendants directed DCYF investigators to conduct special visits to daycares owned by persons of Somali descent outside of the usual annual or semi-annual schedules for such visits for the purpose of obtaining attendance records to assess for potential fraud. Defendants also directed DCYF analysts to comb results from prior investigations to identify instances where there might be a basis to accuse Somali-owned daycares of fraud but where DCYF or DHS had previously declined to make such determinations.

19.     On information and belief, few or none of the daycares targeted for either special investigation or special reassessment of prior investigations were owned by persons of anything other than Somali or other East African ancestry.

20.     Pursuant to DCYF's ethnically targeted campaign of appeasement, Plaintiffs HOPKINS CCC and CLOUD received notices of "temporary" suspension from the CCAP program.  The notices stated that DCYF had received "credible allegations" of fraud and stated that HOPKINS CCC and CLOUD were permitted to provide information to DCYF on why the payment suspensions should not continue.  But rather than specifying the nature of any fraud allegations, the notices contained only general language about the many types of fraud that can theoretically be found in daycare operations.

9

21.    The initial notices received by HOPKINS CCC and CLOUD were also internally self-contradictory, stating that the CCAP suspensions were a temporary measure pursuant to an ongoing investigation but also including language indicating that DCYF had already reached a final determination of an appropriate sanction.  This language indicated that DCYF was not, in fact, pursuing a good-faith investigation but was instead engaging in a sham investigation designed to justify a predetermined conclusion that HOPKINS CCC and CLOUD had engaged in fraud while using the purportedly "temporary" CCAP suspension—which is not subject to administrative or judicial appeal under Minnesota law—as a tool for imposing an *indefinite* CCAP suspension while denying HOPKINS CCC and CLOUD any opportunity for judicial review. DCYF ignored emails from counsel for HOPKINS CCC and CLOUD seeking clarification of the internally contradictory language in the initial CCAP suspension notices.

22.    ZAMZAM received a similar notice to that received by HOPKINS CCC and CLOUD.  Like those notices, the notice received by ZAMZAM did not list specific allegations but instead listed only vague allegations of violations in general categories of allegations.  The ZAMZAM notice also contained the same self-contradictory language contained in the original HOPKINS CCC and CLOUD notices.

23.    In response to the notice it received, ZAMZAM expressed confusion about the possible nature of any allegations of fraud, since it was a small family daycare with a capacity of only 10 which had served mostly the same families for over 10 years with no allegations of fraud. ZAMZAM offered to completely open its books to DCYF and to address any concerns DCYF might have.

24.    After this suit was originally filed in Minnesota state court, HOPKINS CCC, CLOUD, and ZAMZAM received "amended" CCAP suspension notices.  The amended notice to

HOPKINS CCC claimed that a Minnesota Department of Human Services Office of Inspector General[1] surveillance operation HOPKINS CCC had overbilled CCAP in March and April of 2023, nearly three years before DCYF sent the initial CCAP suspension notice to HOPKINS CCC in the aftermath of the Shirley video.

25.     The gap in time between the purported surveillance operation and the issuance of the CCAP suspension notice to HOPKINS CCC combined with the fact that the 2023 allegations were only made specific *after* HOPKINS CCC pointed out the vagueness of DCYF's initial allegations justifies the inference that the 2023 allegations are pretextual and that the true purpose of the CCAP suspension notices issued to HOPKINS CCC was for DCYF to be seen targeting Somali-owned childcare centers in the hopes of appeasing the federal government.

26.     Similarly, the amended notice to CLOUD claimed that a DHS OIG surveillance operation had exposed overbilling from January through March 2025, nearly a full year before DCYF sent the initial CCAP suspension notice to CLOUD in the aftermath of the Shirley video.

27.     On information and belief, the purported "credible allegations" of fraud against Plaintiffs HOPKINS CCC and CLOUD cited in the initial CCAP suspension notices in fact reflected Defendants' decision to simply accept the allegations in Shirley's video as "credible" so that Defendants could attempt to appease the federal government by "throwing Plaintiffs under the bus" and did not reflect any objective or good-faith investigation of Plaintiffs' childcare operations.

28.     The gap in time between the purported surveillance operation and the issuance of the CCAP suspension notice to CLOUD combined with the fact that the 2025 allegations were

---

[1] DCYF is a successor agency to the Minnesota Department of Human Services' oversight of the CCAP program in Minnesota.

only made specific *after* CLOUD pointed out the vagueness of DCYF's initial allegations also justifies the inference that the 2025 allegations are pretextual and that the true purpose of the CCAP suspension notices issued to CLOUD was for DCYF to be seen targeting Somali-owned childcare centers in the hopes of appeasing the federal government.

29.     On March 4, 2026, DCYF issued an amended notice to ZAMZAM, purporting to provide the additional details requested by ZAMZAM's attorney.  But the amended notice continued to be too vague to permit ZAMZAM to respond, alleging only that comparison of attendance records from February and March 2025 with CCAP billing records "showed evidence of CCAP violations."

30.     Although the amended notice to ZAMZAM emphasized the "temporary" nature of the withholding action and promised a response to ZAMZAM's reconsideration request within 90 days, the amended notice continued to use language indicating that DCYF had prejudged the issue by choosing a "sanction" of payment withholding.

31.     The timing of the amended notices to HOPKINS CCC, CLOUD, and ZAMZAM justifies the inference that DCYF sought *ex post facto* to identify any available justification for its initial notices in the hope that it would provide a defense against the present litigation.

32.     The amended notices to HOPKINS CCC, CLOUD, and ZAMZAM also continued to contain the internally contradictory language indicating that there was nothing temporary or provisional about DCYF's fraud determination because DCYF had already selected "the appropriate sanction."

33.     Although the requests for reconsideration from HOPKINS CCC, CLOUD, and ZAMZAM emphasized each facility's willingness to cooperate in any investigation, DCYF has declined to allow any of Plaintiffs to meet with or engage in discussions with DCYF investigators

12

and has instead kept its purported investigations self-contained within DCYF, drawing inferences and conclusions without allowing facility owners a chance to address specific concerns.

34.     The above totality of the circumstances surrounding the initial and amended notices to HOPKINS CCC, CLOUD, and ZAMZAM and DCYF's general refusal to allow targeted facilities to actively cooperate with its purported investigations justifies the inference that DCYF's investigations are a sham and that the results are predetermined by DCYF's perceived need to find "fraud" every time it looks at a Somali-run child-care center in the hopes that doing so will mollify federal officials and their supporters who believe that all Somalis are engaged in fraud.

35.     Plaintiff SCCC also received a CCAP payment suspension notice in the aftermath of the Shirley video, stating that DCYF investigators had determined that there were both "credible allegations" of fraud and that there was a "preponderance of evidence" of fraud based solely on DCYF's inference drawn from its observation that several sign-in sheets used by SCCC for taking attendance appeared to be in the same person's handwriting.

36.     Like the internally contradictory language in the notices to HOPKINS CCC, CLOUD, and ZAMZAM, the internally contradictory language in the notice sent to SCCC was not really a temporary withholding pursuant to an ongoing good-faith investigation, but was instead a tool used by DCYF to engage in a sham investigation designed to justify a predetermined conclusion that SCCC had engaged in fraud while using the purportedly "temporary" CCAP suspension—which is not subject to administrative or judicial appeal under Minnesota law—as a tool for imposing an *indefinite* CCAP suspension while denying SCCC any opportunity for judicial review.  DCYF ignored email from counsel for SCCC seeking clarification of the internally contradictory language in the CCAP suspension notices.

37.     Substantively, the allegation against SCCC, while specific, did not reflect a good-faith determination of potential fraud because DCYF made no effort to determine *why* some or many or even all of the attendance sheets might reflect the same person's handwriting nor did DCYF make any effort to determine or explain *how* such a situation could constitute fraud. Instead, DCYF simply used the purported irregularity to *presume* fraud in order to meet its goal of trying to pander to the federal government's openly expressed bias against Somalis.

38.     Had DCYF conducted even minimal investigation regarding the handwriting on the SCCC attendance sheets, it would have discovered that it resulted from an effort by SCCC to guard against errors made by parents—many of whom have very limited English reading and writing ability—in attendance sign-in sheets, in specific reaction to DCYF policies holding CCAP providers solely responsible for all errors made by parents on attendance records. But DCYF did not make any such inquiry before issuing the CCAP suspension notice to SCCC, even though Minnesota law defines a "credible allegation of fraud" to include a requirement that any allegation be verified by the DCYF commissioner.

39.     Although all of CCAP the notices stated that their recipients were permitted to provide information to DCYF on why the payment suspension should not be continued, the notices did not allow Plaintiffs any mechanism to obtain any independent review—judicial or otherwise—of the factual basis for their issuance or DCYF's purported credibility determination. As such, the notices left Plaintiffs with no recourse to rebut the allegations made against them, protect the ability of their businesses to operate, or to defend their reputations against an intense and ongoing assault from powerful political forces motivated by racial animus.

## V.   CLAIMS FOR RELIEF

**A.   COUNT ONE: SELECTIVE DISCRIMINATORY ENFORCEMENT—42 U.S.C. § 1983 (BY ALL PLAINTIFFS AGAINST INDIVIDUAL DEFENDANTS)**

40.   Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

41.   Defendants' decision to respond to the allegations of fraud among CCAP recipients by conducting special investigations *exclusively* at childcare centers believed to be owned by persons of Somali ancestry constituted selective discriminatory enforcement, in violation of Plaintiffs' constitutional rights under the Equal Protection Clause of the United States Constitution.

42.   Defendants acted under color of state law, rendering their conduct actionable under 42 U.S.C. § 1983.

43.   Defendants' discriminatory actions were part of a stark pattern of selective enforcement extending back for at least a decade by Minnesota state agencies, including DCYF and DHS and encompassing multiple industries, including child-care providers.

44.   Defendants' selective targeting of Plaintiffs for special investigations and/or CCAP suspensions due to their racial and/or ethnic identity resulted in financial losses to Plaintiffs, justifying an award of damages over $50,000 and in an exact amount to be proven at trial.

45.   Defendants' own conduct renders it impossible to identify non-Somali providers that might be liable for similar fraud to that alleged against Somali providers because few or no investigations target non-Somali providers in the first place.

46.   Plaintiffs also suffered extreme mental anguish and harm as a result of Defendants' willing and intentional participation in a program of racial and/or ethnic discrimination that included receipt of hundreds of death threats and substantially added to a broader environment of

extreme fear among members of Minnesota's Somali community, justifying an additional award of damages over $50,000 and in an exact amount to be proven at trial.

47.     Plaintiffs are also entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

**B.      COUNT TWO: DENIAL OF PROCEDURAL DUE PROCESS—42 U.S.C. § 1983 (BY ALL PLAINTIFFS AGAINST INDIVIDUAL DEFENDANTS)**

48.     Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

49.     Defendants' initial notices of CCAP suspension to HOPKINS CCC, ZAMZAM, and CLOUD failed to provide sufficient specification of the purported fraud allegations to allow HOPKINS CCC, ZAMZAM, and CLOUD any meaningful notice of the specific allegations against them or provide any meaningful response to DCYF in response.  This violated HOPKINS CCC's, ZAMZAM's and CLOUD's procedural due process rights under the United States Constitution.

50.     Defendants' amended notices to HOPKINS CCC, CLOUD, and ZAMZAM failed to cure the denial of due process because the notices remained too vague to allow HOPKINS CCC, CLOUD, and/or ZAMZAM to meaningfully identify what information could be conceivably provided to counter the allegations.

51.     Defendants' investigations into HOPKINS CCC, CLOUD, SCCC, and ZAMZAM were sham investigations in violation of constitutional due process because Defendants did not permit Plaintiffs any reasonable opportunity to provide exculpatory information or to rebut Defendants' inferences prior to imposition of a "sanction" against Plaintiffs.

52.     Defendants' investigations into HOPKINS CCC, CLOUD, SCCC, and ZAMZAM were also sham investigations in violation of constitutional due process because the outcome of

each investigation was predetermined by Defendants' goal of finding sacrificial lambs to support Defendants' adopted presumption of rampant fraud among Somali child-care providers.

53. Defendants' notices also relied on investigations that were willfully deficient and devoid of even basic efforts to verify the allegations by inquiry into readily available information. This violated Plaintiffs' procedural due process rights under the United States Constitution.

54. Defendants acted under color of state law, rendering their conduct actionable under 42 U.S.C. § 1983.

55. Defendants' conduct was part of a stark pattern of treating Somali child-care providers as presumptively fraudulent, in contrast to non-Somali providers that enjoy a much lower level of scrutiny, including fewer inspections, less-hostile presumptions drawn from potentially questionable billing entries, and lesser applied sanctions for similar purported violations.

56. As a result of Defendants' violations of due process, Plaintiffs have been rendered unable to effectively provide additional information that could otherwise result in an earlier end to the investigation and/or the avoidance of sanctions. Plaintiffs have also been forced to expend attorney's fees attempting to defend their businesses against vague and shifting allegations.

57. Plaintiffs are therefore entitled to an award of damages as well as attorney's fees under 42 U.S.C. § 1988(b).

## C.   COUNT THREE: DECLARATORY/INJUNCTIVE/MANDAMUS RELIEF (BY ALL PLAINTIFFS AGAINST DCYF)

58.   Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

59.   In 2025, Minnesota enacted a statute requiring that notices of temporary CCAP suspension "state the reasons for withholding payments," permitting only that agencies "need not disclose specific information regarding an ongoing investigation." *See* Minn. Stat. § 15.013, subd. 2. Upon information and belief, the substance of the allegations against Plaintiffs did not require withholding in order to protect any ongoing investigation for the simple reason that DCYF had already obtained and made its assessment of the information, in effect ending its substantive investigation. DCYF therefore had no authority to continue withholding the information at the time it issued its initial notices to Plaintiffs.

60.   Defendants' use of vague and self-contradictory language in its notices of "temporary" CCAP suspensions is also part of a longstanding pattern whereby DHS and DCYF have made it impossible for the targets of such notices to receive any meaningful notice or opportunity to be heard and where judicial review is not available under Minnesota law, as illustrated by prior cases unsuccessfully seeking to obtain both administrative and judicial review.

61.   The consistency of Defendants' use of vague and self-contradictory language in its notices across time and numerous targets raises the inescapable inference that Defendants' use of such vague language is a de facto institutional policy of DCYF, intentionally designed to frustrate the ability of targeted providers to meaningfully respond to the allegations against them. This leads to a strong likelihood that Defendants will continue to use such vague language in any future notices.

18

62.     Plaintiffs are therefore entitled to a declaratory judgment under Minnesota's Declaratory Judgment Act that the use of generalized language in the initial CCAP suspension notices violates state law as well as constitutional due process, and an injunction barring DCYF from using such generalized language as a basis for any CCAP suspension.

63.     Defendants' denial of due process also entitles SCCC to declaratory judgment under Minnesota's Declaratory Judgment Act that DCYF's investigations into the purported "credible allegation of fraud" was insufficient as a matter of law, in violation of constitutional due process, and an injunction requiring that DCYF verify its "fraud theories" by reasonable inquiry into potentially exculpatory information that may be readily available to investigators before issuing CCAP suspension notices.

64.     Plaintiffs are also entitled to an alternative writ of mandamus under Minnesota Statutes section 555 compelling Defendants to rescind the CCAP payment suspensions as being issued contrary to law and in violation of constitutional due process.

65.     Plaintiffs are also entitled to recovery of their attorney's fees under Minn. Stat. § 555.08.

**D.     COUNT FOUR: DECLARATORY/INJUNCTIVE/MANDAMUS RELIEF AS TO HANDWRITING-BASED FRAUD THEORY (BY SCCC ONLY AGAINST DCYF)**

66.     SCCC reasserts the allegations in the paragraphs above as if fully set forth here.

67.     Defendants' determination that the apparent use of one person's handwriting on attendance sheets at SCCC, even if true, cannot support a fraud determination as a matter of law because Defendants cannot identify a specific statute or rule that prohibits CCAP reimbursement in such a situation and, therefore, cannot show that any receipt of CCAP reimbursement based on such attendance records involved SCCC's obtaining "the property of another" as would be required

for any fraud determination under Minnesota law. *See Matter of SIRS Appeal by Best Care, LLC*, 26 N.W.3d 459, 473 (Minn. 2025) (holding that determination of an "overpayment" from government programs requires the state agency to identify a specific statute or regulation that would specifically prohibit payment because of the purported violation).

68.     SCCC is therefore entitled to declaratory judgment that Defendants' allegation regarding handwriting usage on sign-in sheets is insufficient as a matter of law to support a CCAP payment suspension and an injunction barring Defendants from enforcing any CCAP suspension on such grounds in the future.

69.     SCCC is also entitled to an alternative writ of mandamus compelling Defendants to rescind the CCAP payment suspension and an award of damages in excess of $50,000 and in an exact amount to be proven at trial.

70.     Because Defendants' conduct constitutes violations of "the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade," *see* Minn. Stat. § 8.31, subd. 1, SCCC also entitled to an award of attorney's fees, costs of investigation, and costs and disbursements under Minn. Stat. § 8.31, subd. 3a.

71.     Because Defendants' attempts to appease bigots by "throwing SCCC under the bus" constitutes both vexatious conduct and oppressive reasons, SCCC is also entitled to an award of attorney's fees under "the exception to [the general rule against award of attorney's fees without statutory authorization] in cases where the unsuccessful party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Fownes v. Hubbard Broadcasting, Inc.*, 246 N.W.2d 700, 702 (Minn. 1976) (quotation omitted).

72.     SCCC is also entitled to recovery of its attorney's fees under Minn. Stat. § 555.08.

20

73.     SCCC asserts this claim under state law and initiated action in state court. Defendants have waived any Eleventh Amendment or sovereign immunity defenses by removing this matter to federal court.

**E.     COUNT FIVE: BREACH OF CONTRACT UNDER STATE LAW (BY ALL PLAINTIFFS AGAINST DCYF)**

74.     Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

75.     Each Plaintiff had a contractual relationship with DCYF, a material term of which was the implied covenant of good faith and fair dealing, which required DCYF to refrain from unjustifiably hindering each Plaintiffs' ability to perform under the contract.

76.     By accepting Shirley's allegations as credible in spite of their glaring factual defects and obvious bigoted basis, and by using those allegations as the basis to target Plaintiffs for CCAP suspension notices that effectively put Plaintiffs out of business, DCYF breached the implied covenant of good faith and fair dealing.

77.     DCYF also breached the implied covenant of good faith and fair dealing by targeting Plaintiffs for special investigations based on Plaintiff's perceived and/or imputed racial/ethnic identity.

78.     As a result of DCYF's breach, each Plaintiff is entitled to an award of damages in an amount over $50,000 and in an exact amount to be proven at trial.

**F.     COUNT SIX: MANDAMUS (BY ALL PLAINTIFFS AGAINST DCYF)**

79.     Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

80.     Minnesota courts have previously ruled that, under most conditions, CCAP recipients lack a protected property interest in the continued receipt of CCAP funds during a fraud investigation. *See, e.g.*, *Sunshine Childcare Center, LLC v. Ramsey Cnty.*, 7 N.W.2d 611, 618

21

(Minn. Ct. App. 2024) (citing federal cases). But the Minnesota courts have also expressed concern about the use of "temporary" suspensions relying on open-ended claims of ongoing investigations as de facto *permanent* suspensions. *See id.* ("Like in *Shire*, we do find it troubling that the in investigations in this matter have taken over a year with no concrete results."). Pursuant to these concerns, Minnesota courts have highlighted mandamus as an appropriate remedy to force administrative agencies to avoid keeping an investigation open for an unnecessary length of time while a CCAP-dependent provider withers on the vine. *See id.* at 618 n.7 (noting that "other remedies are available to parties looking to force an agency to take an action required by statute for which there is no express timeline" and citing Minnesota's mandamus statute, Minn. Stat. § 586.01).

81.    Plaintiffs are heavily dependent on CCAP funding and are unable to find sufficient private-pay clients to keep their businesses viable if the CCAP suspensions imposed on them are kept open indefinitely.

82.    Recent changes in Minnesota law reflect the belief by the legislature that 60 days is sufficient for an administrative agency to complete an investigation unless a court rules that period should be extended after notice and opportunity to be heard by the affected CCAP provider. *See* Minn. Stat. § 15.013, subd. 2(a) (allowing administrative agencies to withhold payments "for a period not to exceed 60 days if the agency head determined that a preponderance of evidence shows that the program participant has committed fraud to obtain payments under the program."

83.    The statute also requires the agency to "notify the program participate of the decision to withhold payments at least 24 hours before withholding a payment" and to "state the date the administrative withholding period terminates." *Id.*, subd. 2(b).

84.     Upon information and belief, DCYF did not comply with these requirements in the notices sent to HOPKINS CCC, CLOUD, SCCC, or ZAMZAM.

85.     Plaintiffs are therefore each entitled to a preemptory writ of mandamus compelling DCYF to rescind the payment withholds or, in the alternative, an order to show cause why an alternative writ of mandamus should not issue.

86.     Alternatively, Plaintiffs are entitled to a preemptory writ of mandamus compelling DCYF to end its investigation no later than 60 days after the date of the initial notice sent to each Plaintiff, unless DCYF first obtains an order from this Court under Minn. Stat. § 15.013, subd. 4, prior to the expiration of that time period.

87.     The statute further requires that any agency withholding payments must make an accounting of the payments withheld to the commissioner of management and budget no later than March 1, 2026, and that the commissioner of management and budget must provide the reports to legislative representatives by March 15.  *See* Minn. Stat. § 15.013, subd. 5.

88.     Upon information and belief, Defendants have not complied with this subdivision.

89.     Plaintiffs are therefore entitled to a preemptory writ of mandamus requiring that Defendants generate the required reports and provide them to the persons identified in the statute by March 15, 2026 or as soon as possible after the Court issues its order.

**G.      COUNT SEVEN: INJUNCTIVE RELIEF / REMOVAL (BY ALL PLAINTIFFS AGAINST DCYF AND BROWN)**

90.     Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

91.     Minnesota law empowers the head of each administrative agency, including DCYF, to be the final decisionmaker regarding any appeal of any permanent payment withholding, such as a CCAP disqualification.  This empowers the DCYF commissioner to even overrule the

recommendations of an assigned administrative law judge, provided that the commissioner can cherry-pick any "substantial evidence" in the record to support her determination. *See, e.g.*, *In re Excess Surplus Status of Blue Cross and Blue Shield of Minn.*, 624 N.W.2d 264, 274 (Minn. 2001) (holding that an agency commissioner's representative need give no deference).

92. The United States Supreme Court has held that allowing the head of an administrative agency to act as final decisionmakers based on the *presumption* that the administrative decisionmaker remains unbiased and reaches no conclusions until after an investigation is complete and all affected parties have been heard. *See Withrow v. Larkin*, 421 U.S. 35, 50-55 (1975). But this presumption holds only insofar as there are no indications of "bias or prejudgment." *See id.* at 57. The Supreme Court noted that, where reasons exist to believe that "the special facts and circumstances present in the case [render] the right of unfairness [] intolerably high," a district court may consider an injunction removing the administrative head from a given case. *See id.* at 58.

93. Under the particular facts and circumstances of this case, the DCYF commissioner cannot be said to be unbiased or to have avoided prejudgment. As noted above, several of the notices contain a "preponderance of the evidence" determination that is indistinguishable from the standard that would be used in an administrative appeal of any permanent CCAP disqualification or other appeal brought by Plaintiffs. *Compare* Minn. Stat. § 256.0451, subd. 22(b) (noting that preponderance of the evidence is also the standard for final administrative determination of fraud). The notices also contain DCYF's determination that CCAP suspension is an "appropriate sanction," which also indicates substantive prejudgment.

94. DCYF's neutrality is also called into question by the coercive effects of the federal government's demands that DCYF immediately accelerate its findings of fraud, specifically

24

among child-care centers owned by Somali-Americans, or face the possibility that Minnesota's statewide receipt of CCAP funds be endangered.  In short, DCYF has a strong conflict of interest here, where its ability to continue receiving CCAP funds appears to hinge directly on its ability to obtain fraud findings attributed to Somali child-care providers.  *See Winthrow*, 421 U.S. at 47 (noting that decisionmaker bias can be inferred when the "adjudicator has a pecuniary interest in the outcome").

95.     The DCYF Commissioner's neutrality is also reasonably called into question by this lawsuit itself.  The Supreme Court has stated that an agency head's neutrality becomes questionable when the agency head "has been the target of . . . criticism from the party before [her]."  Commissioner BROWN, a former DHS employee, premised her inaugural leadership of DCYF on a claim of commitment to diversity and inclusion.  *See, e.g.*, James Burroughs, *Tikki Brown Knows Firsthand Some of the Challenges Minnesota Children and Families Face*, Children's Minnesota, Jan. 15, 2025,  https://www.childrensmn.org/blog/tikki-brown-knows-firsthand-some-of-the-challenges-minnesota-children-and-families-face-heres-how-she-wants-to-help-them/ ("'In Minnesota, we have significant disparities in the race and ethnicity of program participants across an array of services. We need different solutions to address this, not a one-size-fits-all approach. We have several ongoing efforts we expect to have an impact in tackling disparities, and we are looking to deepen our impact with a whole family systems approach.'" (quoting BROWN)).  This lawsuit fundamentally and unavoidably challenges that narrative, rendering it unlikely that BROWN could provide an unbiased, neutral decision in response to Plaintiffs' appeals.

96.     DCYF's ongoing evolution of justifications from its initial notices through its ongoing amended notices also betrays an intention to justify its predetermined conclusions, not to fairly evaluate Plaintiffs' responses.

97.     Minnesota law also lacks a key structural safeguard against in-house *ex parte* communications between the Commissioner's office and interested persons within the agency during the Commissioner's consideration of an administrative appeal.  *Compare* 5 U.S.C. § 557(d)(1) (barring ex parte communications from interested persons during agency head deliberations), *with* Minn. Stat. § 14.61 (noting that agency officials may make final decision and allowing parties to submit exceptions to ALJ recommendations but containing no prohibition on *ex parte* communications between agency heads and interested persons within the agency); *compare also* Minn. Stat. § 256.0451, subd. 22(c) (barring human services judge from contacting internal agency personnel before making recommendations to commissioner), *with id.*, subd. 23(d) (containing no such prohibition for the commissioner herself).

98.     Plaintiffs are therefore entitled to an injunction mandating that any adjudication of their CCAP suspensions be made by the Court or by an appointed special master, not by DCYF.

## VI.     **PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court:

(1)     Award each Plaintiff actual, consequential, compensatory, and special damages over $50,000 and in an exact amount to be proven at trial;

(2)     Declare that DCYF's notices to CLOUD, ZAMZAM, and HOPKINS CCC violated due process;

(3)     Declare that DCYF's deficient investigation of its allegations against SCCC and ZAMZAM violated due process;

26

(4)     Permanently enjoin DCYF from relying on general, nonspecific language in CCAP suspension notices;

(5)     Permanently enjoin DCYF from issuing CCAP suspension notices without attempting to access readily available exculpatory information;

(6)     Declare that DCYF's basis for its notice to SCCC, even if true, could not support a credible allegation of fraud as a matter of law;

(7)     Permanently enjoin DCYF from relying on any basis substantively similar to that used in future CCAP suspension notices;

(8)     Issue an alternative writ of mandamus compelling DCYF to rescind the CCAP suspension notices against Plaintiffs;

(9)     Issue an injunction barring BROWN from acting as a decisionmaker over Plaintiff's appeals of CCAP suspensions;

(10)    Award each Plaintiff its attorney's fees under 42 U.S.C. § 1888(b) and Minn. Stat. 555.08;

(11)    Award Plaintiff taxable costs and disbursements incurred in this action as permitted under state law.

(12)    Award Plaintiffs prejudgment and postjudgment interest at the highest lawful rates permitted under state law.

(13)    Award Plaintiffs such further relief as Plaintiffs may be entitled and which the Court deems just and proper.

Dated:      3/10/2026                                    /s/ Jason Steck
                                              Jason Steck #0393077
                                              Attorney for Plaintiffs
                                              6160 Summit Drive North, Suite 220
                                              Brooklyn Center, MN 55430
                                              jason@jasonsstecklaw.com
                                              (763) 402-1829


The undersigned hereby acknowledges that sanctions may by imposed under the circumstances set forth in Minn. Stat. § 549.211.


                                              /s/ Jason Steck
                                              Jason Steck (#0393077)


28