UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

HOPKINS CHILD CARE CENTER LLC,
CLOUD ACADEMY LLC,
ST. CLOUD CHILDCARE INC.,
ZAMZAM DAYCARE LLC, and
TAYO DAYCARE INC;

Civil File No. 26-cv-01495

**THIRD AMENDED COMPLAINT**

Plaintiffs,

v.

TIKKI BROWN, individually and in her official capacity;
MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES;
CHRISTOPHER CLIFFORD, individually;
JOHN DOE 1-5, individually; and
JANE DOE 1-5, individually;

Defendants.

---

Plaintiffs submit the following as their Second Amended Complaint in the above-entitled action:

## I.      INTRODUCTION

1.      In the mid-1800s, a large number of Chinese immigrants came to the United States to find work in gold prospecting and railway construction.  After the gold rush ended and the transcontinental railroad was completed, many such immigrants settled in West Coast cities such as San Francisco.  Chinese immigrants faced widespread discrimination, however, and found it difficult to obtain employment from established businesses.  As a result, entrepreneurial and ambitious Chinese immigrants often gravitated towards self-employment, notably including businesses providing laundry services to members of the public, since in-home laundry facilities were rare at the time.  Because of this, the stereotype of the "Chinese laundry" persisted at least

into the 1970s, including the well-known Calgon television commercial touting its "ancient Chinese secret." *See* https://www.youtube.com/watch?v=djMjYgqFrrQ.

2.     In 1880, the city of San Francisco passed ordinances requiring that all public laundries obtain a permit from the city board of supervisors, unless the laundry was located in a building constructed of brick or stone.  The purported purpose of the ordinances was to guard against fires by requiring that laundries in wood buildings be inspected for fire safety before a permit would be granted.

3.     In 1880, there were 320 public laundries in San Francisco, 310 of which were constructed of wood and 240 of which were owned by persons of Chinese descent.  Of the 240 laundry owners of Chinese descent, 150 were arrested, cited, and fined under the ordinance between 1880 and 1885.  Of the 80 non-Chinese laundry owners, none were arrested, cited, or fined.

4.     A Chinese laundry owner, Yick Wo, contested his citation all the way to the United States Supreme Court, which ruled that the Government's selective enforcement of a facially neutral law based on race or ethnicity violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.  *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.").

5.     Yick Wo's experience of being forced by societal discrimination into an industry where his ethnicity is disproportionately prevalent is not unique in American history.  Indeed, to this day, the infamous New York history of "no Irish need apply" signs exists alongside the

persistent prevalence of police officers of Irish descent in the New York Police Department. Similarly, Yick Wo's experience of being targeted for selective enforcement based on his ethnicity persists in the disproportionate prevalence of African-American men among those subjected to "stop and frisk" detentions in New York City. *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153, 166 (S.D.N.Y. 2012) (noting expert analysis of 2.8-million-strong database of stop-and-frisk detentions finding that the policy "unlawfully target[ed] Blacks and Latinos for stops, summonses, arrests, and excessive force").

6.     This case arises from the latest flashpoint in this unfortunate historical pattern. In late December 2025, Plaintiffs were targeted by an ersatz posse led by an internet troll who accused them of engaging in fraudulent billing of the federal Child Care Assistance Program (CCAP), based solely on their Somali ancestry, and published his "findings" in an internet video that was ultimately viewed by millions. After the President of the United States endorsed the troll and condemned all Somalis in Minnesota as "garbage," Defendants adopted the troll's ethnically based presumption that Somali daycares are uniquely likely to be engaged in fraud and selectively targeted Plaintiffs for investigations, imposing indefinite suspensions of Plaintiffs' access to CCAP funds that ensure that Plaintiffs' businesses will fail based on allegations that no reasonable person would find credible and which Plaintiffs have no reasonable opportunity to rebut. Plaintiffs and many others in the Somali-American community were also targeted for death threats in hundreds of voicemails and text messages.

## II.     PARTIES

7.     Plaintiff HOPKINS CHILD CARE CENTER LLC (HOPKINS CCC) is a Minnesota limited-liability corporation doing business as a licensed childcare center in Hennepin County, Minnesota.

3

8.      Plaintiff CLOUD ACADEMY LLC (CLOUD) is a Minnesota limited-liability corporation doing business as a licensed childcare center in Stearns County, Minnesota.

9.      Plaintiff ST. CLOUD CHILDCARE INC. (SCC) is a Minnesota corporation doing business as a licensed childcare center in Benton County, Minnesota.

10.      Plaintiff ZAMZAM DAYCARE LLC (ZAMZAM) is a Minnesota limited-liability corporation doing business as a family childcare facility in Dakota County, Minnesota.

11.      Plaintiff TAYO DAYCARE INC. (TAYO) is a Minensota corporation doing business as a licensed childcare center in Hennepin County, Minnesota.

12.      Each Plaintiff is owned by persons of Somali or other East African descent.

13.      Defendant TIKKI BROWN is the Commissioner of the MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, and is sued in both her individual and official capacity.

14.      Defendant MINNESOTA DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES (DCYF) is an administrative agency of the State of Minnesota.

15.      Defendant CHRISTOPHER CLIFFORD is a DCYF employee and is sued in his individual capacity.

16.      JOHN DOE 1-5 and JANE DOE 1-5 are employees of DCYF or other Minnesota state agencies and are sued in their individual capacities.

17.      BROWN, CLIFFORD, JOHN DOE 1-5, and JANE DOE 1-5 are referred to collectively as Individual Defendants.

### III.     JURISDICTION AND VENUE

18.      This Court has jurisdiction under 28 U.S.C. §§ 2201, 1331, 1343, 1367, and 1441(a) and under *Ex Parte Young*, 28 S. Ct. 441, 209 U.S. 123 (1908).

4

19.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims because those claims are part of the same case or controversy that forms the basis for the Plaintiffs' federal claims.

20.     The United States District Court for the District of Minnesota is the appropriate venue for removal under 28 U.S.C. § 1441(a) because it is the federal district encompassing Ramsey County District Court, where this suit was originally filed, which was the appropriate venue under Minn. Stat. § 542.09 because Defendants DHS and DCYF are located in Ramsey County.

## IV.     FACTUAL BACKGROUND

1.     Plaintiffs are business entities operating childcare facilities licensed by DCYF and each has a contract with the State of Minnesota for CCAP reimbursement.

2.     Under the federally funded Child Care Assistance Program (CCAP), parents who meet certain eligibility criteria can obtain financial assistance for childcare services.  After receiving CCAP approval from county caseworkers, such parents can engage the services of any licensed childcare provider that agrees to accept CCAP reimbursement.

3.     Childcare providers accepting CCAP must maintain DCYF licensure and must also comply with CCAP billing and reporting requirements, which are enforced by DCYF.  Prior to the establishment of DCYF, however, these requirements were enforced by DHS and many of the policies, procedures, assessment tools, and criteria used by DCYF were developed by DHS.  On information and belief, DHS also continues to be involved in providing investigative support to DCYF in CCAP-related fraud investigations.

*December 2025: Plaintiffs Among Those Targeted by Racist Campaign Alleging Fraud*

4.      In December 2025, an internet troll named Nick Shirley with a history of racially prejudiced and anti-Muslim posts conducted a series of ambush interviews targeting Minnesota childcare centers owned by persons of Somali decent, including at least three Plaintiffs (HOPKINS CCC, CLOUD, and SCC).  Shirley claimed the interviews were "investigations" and Shirley claimed that the targeted childcare centers were fraudulent based on their refusals to allow Shirley inside to view the children.

5.      The Shirley videos were misleading in numerous ways, including Shirley's visiting of some of the targeted childcare centers outside of their operating hours, Shirley's ignorance of the structure of the CCAP program, and Shirley's ignorance of the laws and regulations governing childcare operations in Minnesota.  Simply put, Shirley's "fraud theory" of daycares devoid of children was not only inaccurate, it was impossible because of the structure of the CCAP program.

6.      Despite its misleading content, Shirley's video was promoted by state and federal officials and other political figures seeking to score political points.  Many of these endorsements specifically and openly promoted ethnic prejudice by explicitly linking Shirley's fraud allegations to the Somali community in Minnesota.  For example, Minnesota congressional Representative Tom Emmer called for all Somali citizens associated with fraud to be denaturalized and the President of the United States categorically referred to members of the Somali community in Minnesota as "garbage."

7.      Shirley's video was widely published and viewed by millions of people.  As a result of its inflammatory content and the anti-Somali context surrounding it, many members of the Somali community in Minnesota, including several of the Individual Plaintiffs, received numerous threatening communications—including dozens of death threats.  Daycares targeted by Shirley,

6

including Plaintiffs, were also targeted by copycats inspired by Shirley's video, sowing widespread fear among both daycare operators and the parents of children in the daycares.

8.    Defendants were initially cognizant of the obvious defects in and the horrific effects of Shirley's propaganda.  For example, on December 29, 2025, BROWN held a press conference where she stated that "all of the daycares featured in Shirley's video had been the subject of unannounced visits in the past six months" and that "while the day care centers have been subject to past investigations, *the state had found no evidence of fraud*."  Howard Thompson, *YouTuber Nick Shirley Returns to Minneapolis Day Care After Viral Fraud Video*, Fox 9 News, Dec. 30, 2025,    https://www.fox9.com/news/youtuber-nick-shirley-returns-minneapolis-day-care-after-viral-fraud-video (emphasis added).

9.    On December 30, 2025, the federal Department of Health and Human Services (HHS) announced that it was cutting off all CCAP funds to Minnesota pending a new federally mandated "audit" of fraud in Minnesota.  In the announcement, the HHS official noted that he had spoken directly with "the Director of Minnesota's child care services office" regarding the fraud allegations.  *See* Associated Press, *Trump Administration Say's It's Freezing Child Care Funds to Minnesota*, NPR News, Dec. 30, 2025, https://www.npr.org/2025/12/30/g-s1-104049/trump-minnesota-child-care-funding-freeze-fraud-schemes.

10.    On information and belief, the person referred to by the HHS official was an employee of DCYF.

11.    The federal government also initiated a massive and militarized pressure campaign in Minnesota, including deployment of purported fraud investigators from Homeland Security Investigations (HSI), a component of the federal Department of Homeland Security, and a purported "surge" of investigators from the Federal Bureau of Investigation (FBI), a component

of the federal Department of Justice (DOJ).  The Immigration and Customs Enforcement (ICE) agency, a component of the federal Department of Homeland Security, also initiated a highly militarized immigration enforcement campaign targeting, among others, persons of Somali descent in Minnesota.

*DCYF Adopts Racist Premises of Shirley Campaign to Appease Federal Government, Building on DCYF's Long-Standing Animus Towards Somali Childcare Providers*

12. Combined with Defendants' actual and constructive knowledge of the flaws in Shirley's "fraud theory," the statements from federal political officials referenced above put DHS on notice that the federal government's basis for investigating and for demanding that DCYF investigate purported CCAP fraud in Minnesota acting arose from bias against Somalis and not from any good-faith effort to identify potential sources of fraud among Minnesota daycare providers receiving CCAP funds.

13. Defendants responded to the federal pressure campaign with an effort at appeasement, specifically targeting daycare facilities operated by persons of Somali descent, including Plaintiffs, with vague, bad-faith fraud allegations in an effort to appease the federal government by conducting sham investigations focused on the same Somali targets that Shirley and the federal government had claimed were responsible for fraud among Minnesota daycares.

14. On information and belief, Defendants thus not only adopted the racial premise of Shirley's videos to target Shirley's targets but expanded their adoption of Shirley's and the federal government's allegations to include Shirley's repeated inferences that daycare fraud in Minnesota was uniquely and particularly a Somali or East African problem.  As a result, Defendants focused their reactions almost entirely on daycares operated by, or perceived to be operated by, persons of Somali or East African descent.

15. Specifically, Defendants directed DCYF investigators to conduct special visits to daycares owned by persons of Somali descent outside of the usual annual or semi-annual schedules for such visits for the purpose of obtaining attendance records to assess for potential fraud. Defendants also directed DCYF analysts to comb prior investigations to identify instances where there might be a basis to accuse Somali-owned daycares of fraud but where DCYF or DHS had previously declined to make such a determination. Plaintiffs are each among the targets for these targeted special investigations.

16. On information and belief, few or none of the daycares targeted for either special investigation or special reassessment of prior investigations were owned by persons other than Somali or East African descent.

17. This exclusive targeting of Somali-owned child-care providers is not new. Instead, it is part of a longstanding, stark, and continuing pattern of DHS and DCYF officials targeting Somali child-care providers almost exclusively for investigation of purported CCAP fraud and for purported licensing violations. Specifically, DHS and DCYF have since at least 2017 targeted Somali-owned child-care providers almost exclusively for investigations related to allegations of CCAP fraud; CCAP-eligible providers who are not Somali are rarely if ever targeted for investigation.

18. DHS and DCYF have also shown a stark pattern of harsher investigative practices against Somali-owned providers, including pre-deciding the outcome of investigations. For example, when the providers targeted for investigation are Somali, DHS and DCYF investigators have shown a pattern of intentionally limiting their investigations to the obtaining of inculpatory information while refraining from asking questions that would allow the targeted providers any opportunity to substantively address any areas of potential concern prior to being targeted with a

9

"temporary" payment withholding or other sanction. Additionally, when Minnesota law requires DHS and DCYF to allow providers to submit information to DHS/DCYF and request administrative reconsideration, DHS/DCYF routinely refuse to give good-faith consideration to information provided, instead consistently drawing every possible inference against Somali providers in order to justify a preordained decision to find evidence of fraud.

19.     DHS/DCYF along with other government officials in Minnesota have a known history of negative stereotypes and expressions of animus towards the Somali community, particularly regarding Somali-operated child-care centers receiving CCAP payments. *See, e.g.*, John Bowden, *Minnesota Probe Finds No Evidence Day Care Fraud Was Funneling Money to Terrorists*, The Hill, March 13, 2019, *available at* https://thehill.com/homenews/state-watch/433950-minnesota-investigation-concludes-day-care-fraud-not-funneling-money-to/; Ibrahim Hersi, *How a New Group Is Trying to Counter Negative Perceptions About Somali-American Day Cares in Minnesota*, Minn. Post, June 30, 2017, *available at* https://www.minnpost.com/new-americans/2017/06/how-new-group-trying-counter-negative-perceptions-about-somali-american-day-ca/.

20.     The inference that Plaintiffs' child-care centers were targeted solely or primarily because of their perceived Somali ownership is also supported by a stark pattern of apparently discriminatory enforcement actions taken against Somali-owned license-holders over the course of at least the past decade. Specifically, all five appellate cases dealing with DHS allegations of CCAP fraud at child-care centers since 2016 involved providers with Somali ownership. *See Sunshine Childcare Center, LLC v. Ramsey Cnty.*, 7 N.W.3d 611, 613 (Minn. Ct. App. 2024) (Plaintiffs here); *Anoka Cnty. v. Hersi*, No. A22-1208, 2023 WL 4417380, at \*1 (Minn. Ct. App. July 10, 2023) ("Kadar Hersi"); *Gayre v. Minnesota Dep't of Hum. Servs.*, No. A20-1015, 2021

WL 1733370, at *1 (Minn. Ct. App. May 3, 2021) ("Abdirizak Gayre"); *Samiras Day Care Ctr. v. Minnesota Dep't of Hum. Servs.*, No. A18-1170, 2019 WL 178557, at *1 (Minn. Ct. App. Jan. 14, 2019) ("Samiras Day Care Center"); *Kind Heart Daycare, Inc. v. Comm'r of Hum. Servs.*, 905 N.W.2d 1, 4 (Minn. 2017) ("Yasmin Salim").

21.     The same pattern of selective targeting against Somalis shown by DHS and DCYF regarding child-care centers is found in other areas of DHS enforcement as well.  For example, beginning in 2022, DHS initiated a targeted licensing enforcement campaign in Olmsted County against operators of adult foster-care (AFC) facilities.  The campaign was directed by state DHS headquarters and conducted by state DHS investigators even though AFC licensure in Minnesota is primarily the responsibility of county social-services agencies.  Although Somali providers accounted for approximately 30% of AFC providers in Olmsted County, *every single one* of the initial targets for investigation selected by the responsible state DHS licensing official was owned by a Somali person and *all* of the targeted providers were hit with license-revocation proceedings. And when one provider successfully argued that DHS's selected sanction of license revocation contrasted with more lenient sanctions against non-Somali providers with similar purported violations, the DHS commissioner removed the administrative law judge's finding from the commissioner's final order while refusing to provide any reason for doing so.

22.     The inference of discriminatory intent at DHS is also supported by other evidence, including DHS's continuing resistance to discovery requests that seek to document racial and ethnic enforcement patterns.  Specifically, DHS has uniformly opposed all requests that it disclose racial/ethnic enforcement patterns in administrative hearings by citing Minn. Stat. § 256.045, which removed most categories of administrative hearings involving purported fraud allegations from the "contested case hearing" category where procedures akin to civil discovery are permitted

and into the "revenue recapture rules" category of hearing where discovery is strictly limited to issues. DHS also cites excessive costs as a reason for refusing data-practices requests seeking disclosure of its patterns of selecting targets for enforcement. Simply put, DHS shows an awareness of its pattern of discriminatory enforcement by actively resisting any and all efforts by persons investigating such matters to obtain *any* accounting of DHS's internal enforcement criteria.

*Plaintiffs Receive Notices of "Temporary" Payment Suspensions*

23.    Pursuant to DCYF's targeted campaign of appeasement, each Plaintiff received notices of "temporary" suspension from the CCAP program. The notices stated that DCYF had received "credible allegations of fraud" and that payments would be withheld until such time as the investigations were concluded.

24.    In its notices to HOPKINS CCC, CLOUD, and ZAMZAM, rather than specifying the nature of any fraud allegations, DCYF simply listed general language about the many types of fraud that can theoretically be found in daycare operations.

25.    In notices to SCCC and TAYO, DCYF did reference specific bases for alleging fraud, but failed to consider easily determinable potentially exculpatory explanations for the facts found. Specifically, in its notice to SCCC, DCYF alleged that the fact that attendance sheets were found to have been filled out in the same person's handwriting justified the inference of fraud, but DCYF failed to consider that such handwriting similarity might merely be a reflection of the fact that a receptionist filled out the attendance sheets as parents dropped their children off in order to guard against potential errors that might be made by parents with limited English writing skills. Similarly, in its notice to TAYO, DCYF alleged fraud due to possible discrepancies between

12

payroll records and employee-time submissions for the Great Start grant program, but DCYF failed to consider that payroll records might not reflect the totality of compensated work.

26.     Each notice also stated that the recipient was permitted to provide information to DCYF on why the payment suspensions should not continue. Plaintiffs were directed to submit that information directly to the same person who had decided to suspend payments in the first place. And the notices specifically told Plaintiffs that no administrative or judicial appeal was allowed.

27.     The initial notices were often also internally self-contradictory, stating that the CCAP suspensions were a temporary measure pursuant to an ongoing investigation but also including language indicating that DCYF had already reached a final determination of an appropriate sanction. DCYF ignored emails from counsel for HOPKINS CCC and CLOUD seeking clarification of the internally contradictory language in the initial CCAP suspension notices.

*Plaintiffs' Requests for Reconsideration Are Summarily Denied*

28.     In response to each notice, each Plaintiff submitted a request for reconsideration, highlighting the difficulty in responding to vague and conclusory allegations but also expressing a willingness to cooperate with any ongoing investigation and specifically requesting the opportunity to provide explanations for any billing discrepancies.

29.     DCYF ignored all of these offers, refused to meet with any Plaintiff, and conducted no additional investigation. Instead, DCYF mined earlier inquiries to provide grist for "amended" notices that purported to provide some specifics to support allegations of fraud. But the timing of these specifics, coming weeks after DCYF had supposedly already determined that there were "credible allegations of fraud" justifies the inference that these amendments were after-the-fact

13

attempts to justify decisions already reached rather than indications of actual ongoing investigations. Specifically, DCYF discovered that its vague notice to HOPKINS CCC was justified by its later discovery of billing discrepancies from more than three years before it issued the vague notice in the aftermath of the Shirley video. Similarly, DCYF discovered that its vague notices to CLOUD and ZAMZAM were justified by its discovery of billing discrepancies from nearly a year prior to the issuance of its vague notices in the aftermath of the Shirley video.

30.     The amended notices continued to contain the self-contradictory language from the initial notices, claiming that an investigation was ongoing but also stating that DCYF had already concluded that fraud had occurred and that CCAP suspension was the appropriate sanction.

31.     DCYF also summarily rejected efforts by TAYO and SCCC to point out the possibility of innocent explanations for the findings that DCYF believed constituted evidence of fraud. In fact, instead of engaging in reconsideration, DCYF adopted a reflexively adversarial posture, rejecting out-of-hand any possibility of an innocent explanation in favor of an immediate reaffirmation of its initial determination without engaging the substance of TAYO's and SCCC's explanations. DCYF also ignored TAYO's and SCCC's specific offers to produce the individuals responsible for the issues DCYF was supposedly concerned about.

32.     In each of its responses to Plaintiffs' requests for reconsideration, DCYF reiterated its claim that there was an ongoing investigation and restated its advisory that the "temporary" CCAP payment suspension remained due to the ongoing investigation. On information and belief, however, there was no ongoing investigation and the "temporary" payment suspensions were in fact intended to remain in place indefinitely while preventing any avenue for independent administrative or judicial appeal.

33.     DCYF ultimately issued notices of "administrative disqualification and refusal to pay" as well as overpayment notices to HOPKINS CCC, CLOUD, TAYO, and ZAMZAM.  These notices contained advisories of the recipients' rights to administrative appeals.  Each of these notices also contained, however, an additional reaffirmation of the purported "temporary" CCAP suspension and an advisory that this "temporary" payment withhold would be outside the scope of an administrative appeal.  Thus, even if HOPKINS CCC, CLOUD, TAYO, and/or ZAMZAM were to prevail in an administrative appeal, DCYF expressly reserved the right to continue imposing the "temporary" CCAP suspension regarding which it would brook no appeal.

34.     Although SCCC has not yet received a final decision from DCYF, the tone of DCYF's response to SCCC's reconsideration request justifies the inference that DCYF has made a final determination and that DCYF's mind is closed to any possibility that SCCC might be exonerated by any additional investigation or proffer of information.

35.     No Plaintiff has observed any indication of any ongoing investigation by DCYF. To the contrary, DCYF has *without exception* actively refused each Plaintiff's efforts to provide explanations or to meet with DCYF investigators to address specific allegations or concerns.  On information and belief, DCYF's investigation activities with regard to each Plaintiff ceased upon identification of a pretext for issuance of the associated "temporary" payment suspension and DCYF has no intention of conducting any additional investigation.  Instead, in conformity with its practice in earlier cases, DCYF intends to use the "temporary" payment suspension as an *indefinite* payment suspension, ensuring failure of Plaintiffs' businesses long before any Plaintiff will have a meaningful opportunity to be heard.

15

36.   Although using differing titles, CLIFFORD was individually responsible for the content of all of the responses to Plaintiffs' requests for reconsideration, the amended notices, and the notices of administrative disqualification.

*Plaintiffs Have No Access to Neutral Decisionmaker*

37.   Going forward, each Plaintiff faces a blatantly rigged system for administrative review.  Minnesota's system for reviewing DCYF's administrative determinations of whether fraud has occurred does not provide for either full discovery or neutral fact-finding.  Instead, Minnesota's administrative appeal process contains numerous provisions that systematically advantage DCYF and disadvantage targeted providers.  Most fundamentally, Minnesota's administrative review processes do not require that the decisionmaker be unbiased.  Instead, providers must pursue their appeals in front of an administrative-law judge (for CCAP disqualifications) or a DCYF "fair-hearing" judge (for overpayment determinations), both of which lack authority to consider important aspects of the problem, including DCYF's track record for selective enforcement.

38.   Minnesota's system for administrative appeals also contains several other features that advantage DCYF and tilt the field heavily against Plaintiffs, including (1) strict limits on discovery; (2) allowing DCYF to withhold or suppress exculpatory information; (3) permitting DCYF to rely on hearsay testimony as the basis for final factual determinations; and (4) permitting ex parte communications between DCYF investigators and the DCYF Commissioner prior to the Commissioner's final determination.

39.   Even if Plaintiffs should overcome the heavily tilted playing field set against them for administrative hearings, Plaintiffs face the near certainty that any victory would eb ephemeral because Minnesota law allows the DCYF commissioner to overrule, without substantive

16

explanation, any adverse factual or legal determinations made by the administrative-law judge, even in cases such as this one where DCYF has already adopted a clear, hostile stance towards each Plaintiff.

40.     As a result of this accumulation of advantages built-in to Minnesota's system for administrative review, Plaintiffs have no reasonable expectation that they will be meaningfully heard by a DCYF that has already decided it is beneficial to DCYF to throw Plaintiffs under the bus to appease the federal government. In fact, Plaintiffs believe that no administrative appellant in the last five years has *ever* prevailed in an administrative appeal related to any purported "credible allegation" of CCAP fraud. Simply put, once DCYF determines that a "credible allegation" of fraud exists against a Somali CCAP provider, the provider's business is doomed.

## V.     CLAIMS FOR RELIEF

### A.     COUNT ONE: SELECTIVE DISCRIMINATORY ENFORCEMENT—42 U.S.C. § 1983 (BY ALL PLAINTIFFS AGAINST INDIVIDUAL DEFENDANTS)

41.     Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

42.     Individual Defendants' decision to respond to the allegations of fraud among CCAP recipients by conducting special investigations *exclusively* at childcare centers believed to be owned by persons of Somali descent constituted selective discriminatory enforcement, in violation of Plaintiffs' constitutional rights under the Equal Protection Clause of the United States Constitution.

43.     BROWN, as commissioner of DCYF, has individual liability for the actions alleged above by other Individual Defendants within DCYF because BROWN each has throughout her tenure had actual or constructive knowledge of the stark patterns of discrimination alleged herein but has exercised deliberate indifference towards the patterns.  Specifically, BROWN had actual

17

and constructive knowledge that allegations of selective discriminatory enforcement were being made regarding DCYF's enforcement patterns yet took no action to root out, eliminate, or even mitigate the patterns from continuing.

44. BROWN's actual knowledge of the issue of discriminatory enforcement patterns in DHS's actions prior to the establishment of DCYF was specifically acknowledged in her confirmation hearings and in media coverage surrounding her appointment, yet BROWN has continued preexisting patterns of tacit approval for race-based targeting of Somalis, particularly in the aftermath of the Shirley videos.

45. BROWN is also individually liable because BROWN has, upon being made aware of patterns of selective discriminatory enforcement, failed to take any remedial action and each has instead implicitly yet repeatedly endorsed and ratified DCYF's discriminatory actions, even after specifically stating that she was aware of concerns regarding them.

46. Individual Defendants acted under color of state law, rendering her conduct actionable under 42 U.S.C. § 1983.

47. Individual Defendants' selective targeting of Plaintiffs for special investigations and/or CCAP suspensions due to their racial and/or ethnic identity resulted in financial losses to Plaintiffs, including the loss of their businesses. Plaintiffs are therefore entitled to an award of damages in the amount of those losses and in an exact amount to be proven at trial.

48. Plaintiffs also suffered extreme mental anguish and harm as a result of Individual Defendants' willing and intentional participation in a program of racial and/or ethnic discrimination that included receipt of hundreds of death threats and substantially added to a broader environment of extreme fear among members of Minnesota's Somali community,

18

justifying an additional award of damages in an amount two times the amount of Plaintiffs economic damages and in an exact amount to be proven at trial.

49. Plaintiffs are also entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

**B.    COUNT TWO: VIOLATION OF PROCEDURAL DUE PROCESS—42 U.S.C. § 1983 (BY ALL PLAINTIFFS AGAINST INDIVIDUAL DEFENDANTS)**

50. Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

51. Individual Defendants' initial notices of CCAP suspension to HOPKINS CCC, ZAMZAM, and CLOUD failed to provide sufficient specification of the purported fraud allegations to allow HOPKINS CCC, ZAMZAM, and CLOUD any meaningful notice of the specific allegations against them or provide any meaningful response to DCYF in response. This violated HOPKINS CCC's, ZAMZAM's and CLOUD's procedural due process rights under the United States Constitution.

52. Individual Defendants' notices to SCCC and TAYO relied on investigations that were willfully deficient and devoid of even basic efforts to verify the allegations by inquiry into readily available information. This violated TAYO's and SCCC's procedural due process rights under the United States Constitution.

53. CLIFFORD exacerbated their denials of Plaintiffs' due process rights by subjecting them to an "administrative reconsideration" process that was transparently a sham. In the responses, CLIFFORD repeatedly demonstrated that he did not, in fact, engage in any meaningful reconsideration regardless of Plaintiffs' proffers of information and instead merely rejected Plaintiffs' responses out-of-hand.

54. BROWN, as commissioner of DCYF, has individual liability for the actions alleged above by DCYF because BROWN each has throughout her tenure had actual or constructive

19

knowledge of the investigatory deficiencies and denials of due process alleged herein but has taken no action to proscribe, limit, or mitigate their usage. In fact, although BROWN has publicly stated that she is personally focused on fraud-related investigations in the aftermath of the Shirley videos, DCYF's misuse of "temporary" payment withholds, its intentionally biased investigations, and its exploitation of Minnesota's unfair statutory system for administrative review has intensified under BROWN. Simply put, BROWN has made denial of due process a central feature of DCYF's response to allegations of CCAP fraud.

55.     Individual Defendants acted under color of state law, rendering her conduct actionable under 42 U.S.C. § 1983.

56.     As a result of Individual Defendants' conduct, Plaintiffs were unable to effectively defend themselves against the allegations made by Individual Defendants before their businesses failed. Plaintiffs are therefore entitled to an award of actual damages and consequential damages in the amount of the value of their lost businesses, in any exact amount to be proven at trial.

57.     Plaintiffs also suffered extreme mental anguish and harm as a result of Individual Defendants' willing and intentional participation in an intentional program designed to strip them of their constitutional due process rights, justifying an additional award of damages in an amount two times the amount of Plaintiffs economic damages and in an exact amount to be proven at trial.

58.     Plaintiffs are also entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

**C.   COUNT   THREE:   DECLARATORY/INJUNCTIVE/MANDAMUS   RELIEF UNDER STATE LAW (BY ALL PLAINTIFFS AGAINST DCYF)**

59.     Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

60.     The notices and amended notices conclusory assertions of "credible allegations of fraud" combined with their lack of specifics are insufficient notice as a matter of law, in violation

of constitutional due process, entitling Plaintiffs to an injunction requiring that DCYF in the provide sufficient detail as to the nature of any purported "credible allegations of fraud" that are sufficient to allow the recipients with notice of the specific allegations regarding which they must defend themselves.

61.     Plaintiffs are also entitled to declaratory judgment that the notices, amended notices, and responses to requests for reconsideration display a presumption of guilt that is incompatible with neutrality sufficient to constitute a meaningful opportunity to be heard, justifying a permanent injunction barring DCYF from having its administrative reconsideration conducted by the same persons who made the initial determination to impose a temporary payment suspension.

62.     Plaintiffs are also entitled to declaratory judgment that the investigative processes used by Defendants are inadequate to fulfill constitutional due-process requirements.  As such, Plaintiffs are entitled to a permanent injunction requiring DCYF to verify its "fraud theories" by reasonable inquiry into potentially exculpatory information that may be readily available to investigators before issuing CCAP suspension notices in the future.

63.     Plaintiffs are also entitled to declaratory judgment that Minnesota's system for administrative review violates due process by (1) denying them the right to be heard in a meaningful time and in a meaningful manner after receiving "temporary" CCAP suspension notices; (2) denies them a fair forum for challenging CCAP suspension notices and overpayment notices, and (3) denies them a neutral decision-maker for administrative review of CCAP suspension notices and overpayment notices.  Plaintiffs are therefore also entitled to a permanent injunction barring DCYF from (1) imposing "temporary" CCAP suspensions for any period longer than 30 days without an opportunity for judicial review of the basis therefor under a probable-

21

cause standard; (2) barring DCYF from using internal DCYF employees as adjudicators; and (3) barring DCYF from overruling the findings of an administrative-law judge after a contested hearing.

64.    Plaintiffs are also entitled to an alternative writ of mandamus under Minnesota Statutes section 555 compelling Defendants to rescind the CCAP payment suspensions.

65.    Plaintiffs are also entitled to recovery of their attorney's fees under Minn. Stat. § 555.08.

**D.    COUNT FOUR: DECLARATORY/INJUNCTIVE/MANDAMUS RELIEF UNDER STATE LAW AS TO HANDWRITING-BASED FRAUD THEORY (BY SCCC ONLY AGAINST DCYF)**

66.    SCCC reasserts the allegations in the paragraphs above as if fully set forth here.

67.    Defendants' determination that the apparent use of one person's handwriting on attendance sheets at SCCC, even if true, cannot support a fraud determination as a matter of law because Defendants cannot identify a specific statute or rule that prohibits CCAP reimbursement in such a situation and, therefore, cannot show that any receipt of CCAP reimbursement based on such attendance records involved SCCC's obtaining "the property of another" as would be required for any fraud determination under Minnesota law. *See Matter of SIRS Appeal by Best Care, LLC*, 26 N.W.3d 459, 473 (Minn. 2025) (holding that determination of an "overpayment" from government programs requires the state agency to identify a specific statute or regulation that would specifically prohibit payment because of the purported violation).

68.    Because Minnesota's system for administrative reconsideration of "temporary" CCAP notices lacks any mechanism for independent review even when the facts alleged by DCYF cannot, even if true, constitute the basis for a "fraud" allegation, SCCC is without legal recourse

to challenge the legal determinations underlying DCYF's imposition of a "temporary" CCAP suspension.

69.     SCCC is therefore entitled to declaratory judgment that Defendants' allegation regarding handwriting usage on sign-in sheets is insufficient as a matter of law to support a CCAP payment suspension and an injunction barring Defendants from enforcing any CCAP suspension on such grounds in the future.

70.     SCCC is also entitled to an alternative writ of mandamus compelling Defendants to rescind the CCAP payment suspension and an award of damages in an exact amount to be proven at trial.

71.     Because Defendants' conduct constitutes violations of "the law of this state respecting unfair, discriminatory, and other unlawful practices in business, commerce, or trade," *see* Minn. Stat. § 8.31, subd. 1, SCCC also entitled to an award of attorney's fees, costs of investigation, and costs and disbursements under Minn. Stat. § 8.31, subd. 3a.

72.     Because Defendants' attempts to appease bigots by "throwing SCCC under the bus" constitutes both vexatious conduct and oppressive reasons, SCCC is also entitled to an award of attorney's fees under "the exception to [the general rule against award of attorney's fees without statutory authorization] in cases where the unsuccessful party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Fownes v. Hubbard Broadcasting, Inc.*, 246 N.W.2d 700, 702 (Minn. 1976) (quotation omitted).

73.     SCCC is also entitled to recovery of its attorney's fees under Minn. Stat. § 555.08.

**E.     COUNT FIVE: BREACH OF CONTRACT UNDER STATE LAW (BY ALL PLAINTIFFS AGAINST DCYF)**

74.     Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

75.     Plaintiffs and DCYF had a contractual relationship, a material term of which was the implied covenant of good faith and fair dealing which required DCYF to refrain from unjustifiably hindering each Plaintiffs' ability to perform under the contract.

76.     By accepting Shirley's allegations as credible in spite of their glaring factual defects and obvious bigoted basis, by using those allegations as the basis to target Plaintiffs for CCAP suspension notices that effectively put Plaintiffs out of business, by using investigations that were intentionally limited to avoid allowing Plaintiffs to provide explanations prior to CCAP suspension, and by refusing reconsideration based on a presumption of guilt, DCYF breached the implied covenant of good faith and fair dealing.

77.     DCYF also breached the implied covenant of good faith and fair dealing by targeting Plaintiffs for special investigations based on Plaintiff's perceived and/or imputed racial/ethnic identity.

78.     As a result of DCYF's breach, each Plaintiff is entitled to an award of damages in in an exact amount to be proven at trial.

79.     Minnesota has waived sovereign immunity for breach-of-contract claims. *See* Minn. Stat. § 3.751.

## VI.     **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

(1)     Award each Plaintiff actual, consequential, compensatory, and special damages in an exact amount to be proven at trial;

(2)     Declare that DCYF's notices in the form received by each Plaintiff violates constitutional due process;

24

(3)     Declare that DCYF's deficient investigation of its allegations against each Plaintiff violated due process;

(4)     Declare that Minnesota's system for administrative review of CCAP suspensions, as-applied to Plaintiffs, violates constitutional due process;

(5)     Permanently enjoin DCYF from relying on general, nonspecific language in CCAP suspension notices;

(6)     Permanently enjoin DCYF from imposing "temporary" CCAP suspension notices for any period longer than 30 days, unless the notice is ratified by judicial review under a probable-cause standard;

(7)     Permanently enjoin DCYF from issuing CCAP suspension notices without attempting to access readily available exculpatory information;

(8)     Permanently enjoin DCYF from using internal DCYF employees as adjudicators of administrative appeals of CCAP disqualifications and/or overpayment notices;

(9)     Permanently enjoin the DCYF Commissioner from overruling the factual and legal determinations of an administrative-law judge in a contested case hearing;

(10)    Declare that DCYF's basis for its notice to SCCC, even if true, could not support a credible allegation of fraud as a matter of law;

(11)    Permanently enjoin DCYF from relying on any basis substantively similar to that used against SCCC in future CCAP suspension notices;

(12)    Issue alternative writs of mandamus compelling DCYF to rescind the CCAP suspension notices against Plaintiffs;

(13)    Award each Plaintiff its attorney's fees under 42 U.S.C. § 1888(b) and Minn. Stat. 555.08;

25

(14)    Award SCCC its attorneys fees under Minn. Stat. § 8.31 and/or as a consequence for DCYF's vexatious and bad-faith conduct.

(15)    Award Plaintiff taxable costs and disbursements incurred in this action as permitted under state law.

(16)    Award Plaintiffs prejudgment and postjudgment interest at the highest lawful rates permitted under state law.

(17)    Award Plaintiffs such further relief as Plaintiffs may be entitled and which the Court deems just and proper.

Dated:    4/21/2026              /s/ Jason Steck
                                 Jason Steck #0393077
                                 Attorney for Plaintiffs
                                 6160 Summit Drive North, Suite 220
                                 Brooklyn Center, MN 55430
                                 jason@jasonstecklaw.com
                                 (763) 402-1829

The undersigned hereby acknowledges that sanctions may by imposed under the circumstances set forth in Minn. Stat. § 549.211.

                                 /s/ Jason Steck
                                 Jason Steck (#0393077)

26