UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Hopkins Child Care Center LLC and Cloud Academy LLC,

Plaintiffs,

vs.

Tikki Brown, Christopher Clifford, John Doe 1-5, and Jane Doe 1-5, *in their individual capacities*,

Defendants.

Case File No. 26-CV-1495 (ECT/DTS)

**DEFENDANTS BROWN AND CLIFFORD MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION ANSWER PLAINTIFF'S FOURTH AMENDED COMPLAIN**

## INTRODUCTION

The Minnesota Department of Children, Youth, and Families ("DCYF") determined that Plaintiffs Hopkins Child Care Center LLC ("Hopkins") and Cloud Academy LLC ("Cloud Academy") overbilled the Minnesota Child Care Assistance Program ("CCAP") by tens of thousands of dollars each, based on evidence gathered in 2023 and 2025, respectively. On that same evidence, DCYF determined both Plaintiffs engaged in other egregious CCAP violations that warranted each provider's CCAP disqualification. Now, Plaintiffs are suing DCYF Commissioner Tikki Brown and DCYF employee Christopher Clifford, in their individual capacities, claiming the defendants' actions within DCYF to investigate and take administrative action against Plaintiffs violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Plaintiffs' sole claim for selective discriminatory prosecution fails for insufficient pleading and because both Defendants Brown and Clifford are entitled to qualified immunity against the claim.

## STATUTORY AND FACTUAL BACKGROUND

### I. MINNESOTA'S CCAP PROGRAM.

CCAP expands access to affordable childcare by paying childcare costs for children of income-eligible families. *See* Minn Stat. §§ 142E.02, subd. 1 and 142E.08. CCAP is administered by DCYF, while individual counties manage program eligibility determinations for both childcare providers and recipients. *See* Minn. Stat. §§ 142E.02, 142E.03, and 142E.16. As a condition of payment, all providers are required to keep accurate daily attendance records that include the date, the first and last name of each child in attendance, and the time for drop off and pick up. *See* Minn. Stat. § 142E.16, subd. 7(a)-(b). The DCYF Commissioner "is responsible for ensuring the detection, prevention, investigation, and resolution of fraudulent activities or behavior" by participants in CCAP and other programs. Minn. Stat. § 142A.03, subd. 2(q). To that end, the Legislature has given the Commissioner broad authority to protect public funds pending investigations into and sanctions against CCAP providers.

When the DCYF Commissioner determines there is a "credible allegation of fraud for which there is an investigation pending against a program," including CCAP providers, "the commissioner may withhold payments" to that entity temporarily. Minn. Stat. § 142A.12, subd. 5(a). DCYF is authorized to begin withholding payments prior to notifying the subject provider, and then to notify the provider of only "the general allegations related to the withholding actions." *Id.* at subd. 5(c). The DCYF notice to the subject provider "need not disclose specific information concerning an ongoing investigation." *Id.* at subd. 5(c)(2).

A provider subject to a section 142A.12 temporary payment withhold is entitled to request reconsideration and receive a decision within 60 days of that request. *Id.* at subd. 5(d). DCYF is authorized to maintain the temporary payment withhold until "the commissioner determines there is insufficient evidence of fraud by the provider . . . or when legal proceedings related to the alleged fraud are completed," unless the commissioner has initiated a sanction against the provider, for which appeal rights are available. *Id.* at subd. 5(e). The Legislature has explicitly prohibited section 142A.12, subd. 5 payment withhold from administrative appeal. *Id.* at subd, 5(f). Accordingly, suspending payments under section 142A.12, subd. 5 does not implicate constitutional due process. *See Sunshine Childcare Ctr.,* 7 N.W.3d at 617-618 (*citing Shire v. Harpstead*, No. A19-0807, 2019 WL 7287088, at *4 (Minn. Ct. App. Dec. 30, 2019)) (holding that providers do not have a property interest in Medicaid payments while an investigation is pending)).

DCYF also has CCAP-specific stop payment and sanction authority. After completing an investigation, DCYF may pursue multiple actions and administrative sanctions. Minn. Stat. § 142E.51, subd. 7. Those sanctions may include the provider's administrative disqualification from CCAP and monetary recovery. *Id.* at subd. 7(c). DCYF is also authorized to stop payments pending a CCAP provider's administrative disqualification proceeding. Minn. Stat. § 142E.17, subd. 9(d).

A provider is entitled to a "fair hearing" before a Human Services Judge of the Minnesota Department of Human Services ("DHS") to challenge its section 142E.51, subd. 5 administrative disqualification before the disqualification takes effect. Minn. Stat. §§ 142E.18, subd. 1(a), 142A.20; Minn. R. 3400.0183, subp. 5. The Human Services Judge

then recommends an order to the DCYF Commissioner on the action, and the Commissioner subsequently issues a final order on the administrative disqualification.[1] Minn. Stat. § 142A.20, subd. 3(a). Any party aggrieved by the Commissioner's order may request the Commissioner's reconsideration and/or seek judicial review in state district court. *Id.* at subd. 3(b), subd. 5.

## II. The Parties.

Plaintiffs Hopkins Child Care Center LLC ("Hopkins") and Cloud Academy LLC ("Cloud Academy") are corporations who provided CCAP funded childcare services in Minnesota. (Doc. 55 ¶¶ 7-8, 23.) Both plaintiffs are owned by persons of Somali or other East African descent. (*Id.* at ¶ 9.)

Defendant Tikki Brown is the DCYF Commissioner. (Doc. 55 ¶ 10.) Defendant Christopher Clifford is a DCYF employee allegedly "personally responsible for directing DCYF investigations." (*Id.* at ¶ 11.) The five John Doe and five Jane Doe defendants are allegedly all "employees of DCYF or other Minnesota state agencies personally responsible for directing DCYF investigations." (*Id.* at ¶ 12.)

All defendants are sued only in their individual capacities. (Doc. 55 ¶¶ 10-12.)

## III. Factual Allegations Against Defendants Brown And Clifford[2]

Plaintiffs allege that going back "at least" to 2017, the state agencies responsible for CCAP administration have "almost exclusively" targeted Somali-owned childcare providers

---

[1] Constitutional claims are beyond the scope of a DHS fair hearing. *See* Minn. Stat. § 256.0451, subd. 16.

[2] Defendants Brown and Clifford do not admit any of the allegations in Plaintiffs' Complaint but acknowledge that for purposes of a motion to dismiss, the allegations are taken as true. *See Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019).

for investigations into alleged CCAP fraud. (Doc. 55 ¶ 17.) In 2024, DCYF was created and soon after acquired CCAP administration from DHS. *See* DCYF, "Transition to DCYF," https://dcyf.mn.gov/about-us/transition-dcyf, last accessed Oct. 13, 2026. Plaintiffs do not allege that any of the twelve defendants were involved in the supposed pre-DCYF "targeting" of Somali or other East-African owned daycares.

Plaintiffs allege that in December 2025, approximately eight years into the alleged state agency focus on CCAP fraud investigations into East African owned daycares, Defendants "adopted the racial premise" of inflammatory videos by an internet provocateur regarding allegations of CCAP fraud. (Doc. 55 ¶¶ 4-14.) Supposedly due to the video and pressure from federal agencies and elected officials, Defendants allegedly "focused their reactions almost entirely" on daycares they believed to be operated by persons of East African descent. (*Id.* at ¶14.) Plaintiffs specifically claim that all twelve defendants "personally directed DCYF investigators" to conduct special visits to Plaintiffs and other East African-owned daycares "for the purpose of obtaining attendance records to assess for potential fraud." (*Id.* at ¶ 15.) Allegedly, each of the twelve defendants also directed "DCYF analysts" to review prior investigations for potential bases to accuse Somali-owned daycares of fraud. (*Id.*)

As a result of this purported "campaign," Plaintiffs claim the eleven other defendants "direct[ed]" Mr. Clifford to issue notices stating the existence of a credible allegation of fraud for which investigation was pending against each plaintiff. (Doc. 55 ¶¶ 23-24) Those notices stated that DCYF was withholding payments to each plaintiff until those investigations

concluded. (*Id*. at ¶ 23.) Plaintiffs allege the notices "simply listed general language about the many times of fraud that can theoretically be found in daycare operations rather than specifying the nature of any fraud allegation," suggesting that DCYF "had not yet identified any specific indications of fraud regarding Plaintiffs other than the [internet] video." (Doc. 55 ¶ 25.) In reality, [3] the Hopkins notice states that DCYF "reviewed CCAP provider records and videos and determined" that Hopkins:

> [F]ailed to accurately bill an absent day or holiday on a day(s) when children did not attend . . . willfully or intentionally withheld, concealed, or misrepresented information for the purpose of obtaining CCAP or to assist someone else to receive CCAP . . . demonstrated a pattern of conduct that violated program rules under Chapter 142E . . . failed to comply with attendance record keeping requirements . . . and gave statements that were not honest and truthful.

(Garay Heelan Dec. Ex. 1.) The Cloud Academy notice similarly states that DCYF "reviewed CCAP provider records and videos and determined" that Cloud Academy:

> [F]ailed to accurately bill an absent day or holiday on a day(s) when children did not attend . . . failed to comply with attendance record keeping requirements . . . intentionally gave the county materially false information on the provider's billing forms or provided false attendance records to a county or the commissioner . . . committed an intentional program violation by intentionally misrepresenting, concealing, or withholding facts and repeatedly and intentionally violating program violations under chapter 142E . . . and repeatedly and intentionally violated child care assistance requirements under 142E.

---

[3] The Court may consider, among other things, the complaint and materials embraced by the complaint to decide a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). The Fourth Amended Complaint embraces the notices of payment withhold and administrative disqualification notices by characterizing their contents as evidence of the selectively discriminatory enforcement at issue. (Doc. 55 ¶¶ 23-26, 29-30.)

(Garay Heelan Dec. Ex. 4.) DCYF states in each notice that it is issued pursuant to section 142A.12, subd. 5. (Garay Heelan Dec. Exs. 1, 4.)

When the DCYF Commissioner determines there is a "credible allegation of fraud for which there is an investigation pending against a program," including CCAP providers, "the commissioner may withhold payments" to that entity temporarily. Minn. Stat. § 142A.12, subd. 5(a). DCYF is authorized to begin withholding payments prior to notifying the subject provider, and then to notify the provider of only "the general allegations related to the withholding actions." *Id.* at subd. 5(c). The DCYF notice to the subject provider "need not disclose specific information concerning an ongoing investigation." *Id.* at subd. 5(c)(2).

Plaintiffs each requested reconsideration of their section 142A.12 payment withhold notices. (Doc. 55 ¶ 28.) Instead of attending to the substance of those requests, Plaintiffs allege that Defendants Clifford, John Doe 1-5 "and/or" Jane Doe 1-5 further reviewed investigatory material "to provide some specifics to support allegations of fraud" and then issued amended notices to each plaintiff. (*Id.* at ¶ 29.) Like the initial notices, the amended notices included lists of specific violations of law for which DCYF was investigating each of the plaintiffs. (Garay Heelan Dec. Exs. 3, 6.) Additionally, the amended notice to Hopkins states:

> "[B]etween March 25, 2023 and April 23, 2023, Hopkins overbilled CCAP by approximately 903 children over 29 days that were reviewed. OIG conducted surveillance at Hopkins during this time period and observed 836 children entering the center, whereas Hopkins billed for 1739 CCAP children on those same days."

(Garay Heelan Dec. Ex. 3.) And the amended notice to Cloud Academy states:

> OIG conducted surveillance and collected records regarding attendance at Cloud Academy between January 10, 2025 and March 19, 2025. Over 8 random

> days reviewed during this period, surveillance and other evidence showed that Cloud Academy significantly overbilled CCAP based on attendance. DFYC observed that Cloud Academy overbilled CCAP by approximately 560 children over these 8 days . . . .

(Garay Heelan Dec. Ex. 6.)

"[U]ltimately," Plaintiffs plead,[4] DCYF issued notices of administrative disqualification and refusal to pay to each plaintiff, which they attribute to Defendant Clifford. (Doc. 55 ¶ 30.) Those notices inform each plaintiff that DCYF was subject to a payment stop under Minn. Stat. § 142E.17 pending the provider's administrative disqualification from CCAP. (Garay Heelan Dec. Exs. 2, 5.) The notices advise each plaintiff of its appeal rights and identify billing overpayment amounts owed to the state. (*Id.*) The notice to Hopkins identifies a $62,247.20 overpayment, and the notice to Cloud Academy identifies a $23,815.80 overpayment. (*Id.*)

Plaintiffs in their Fourth Amended Complaint do not contest the accuracy of DCYF's findings articulated in its notices, the bases of their disqualifications, or the overbilling amounts that DCYF seeks to recuperate from either of them. Instead, the plaintiffs allege the legislatively-enacted administrative appeal system is rigged against them such that they "have essentially no chance of finding any remedy for Defendants' actions in the administrative appeals process." (Doc. 55 ¶ 30.)

---

[4] Plaintiffs describe the amended payment withhold notices and administrative disqualification notices out of order. The administrative disqualification notices issued first, on February 24 and 25, 2026. (Garay Heelan Dec. Exs. 3, 6.) The amended payment withhold notices issued second, on March 3, 2026. (*Id.* at Exs. 2, 5.)

## IV. Procedural History.

Plaintiffs filed their original complaint on January 28, 2026, in a state district court. (Doc. 1-1.) Defendants removed the case to this Court on February 17, 2026. (Doc. 1.) Following multiple rounds of meeting and conferring, Plaintiffs filed amended complaints until finally filing the Fourth Amended Complaint on September 21, 2026, which is now at issue. (Docs. 13, 36, 55.) The Fourth Amended Complaint brings only a 42 U.S.C. § 1983 claim against Defendants in their individual capacities, for allegedly violating Plaintiffs' "constitutional rights under the Equal Protection Clause of the United States Constitution." (Doc. 55 ¶¶ 31-38.)

## STANDARD OF REVIEW

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true and construes the pleadings in a light most favorable to the non-moving party. *See Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019). The Court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding the motion. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). The Court, however, need not accept as true conclusory allegations, or legal conclusions drawn by the pleader from the facts alleged. *See Hager v. Ark. Dep't. of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013); *Hanten v. Sch. Dist. Of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal,*

556 U.S. 662, 680-81 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Rather, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint does not need to describe "detailed factual allegations," but it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* (citing *Twombly*, 550 U.S. at 555).

**ARGUMENT**

Plaintiffs' sole selective discriminatory enforcement claim fails because Plaintiffs do not sufficiently plead either Defendant Brown's or Defendant Clifford's individual involvement in their claim, and both Defendant Brown and Defendant Clifford are entitled to qualified immunity against the claim.

In an action under 42 U.S.C. § 1983, each individual defendant can only be liable for their own action or inaction. A plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the constitution. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001) (plaintiff "failed to allege sufficient personal involvement by any of defendants" where "[t]he only allegation close to establishing personal involvement by any of the defendants is [plaintiff's] claim that [two defendants] instituted departmental policies that somehow deprived him of personal property."); *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (affirming dismissal of a complaint where plaintiff "failed to allege facts supporting any individual defendant's personal involvement or responsibility for the violations."). Merely alleging a defendant is

liable because the defendant had a supervisory position with authority to implement policies or direct daily operations fails to allege sufficient personal involvement in an alleged unconstitutional act. *See Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988) ("supervisor must know about the [allegedly illegal] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see.").

The Equal Protection Clause of the Fourteenth Amendment prohibits selective enforcement of the law based on considerations such as race, ethnicity, or religion. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *Gilani v. Matthews*, 843 F.3d 342, 347 (8th Cir. 2016). To make a selective enforcement claim, a plaintiff must show that the enforcement had discriminatory effect and was motivated by a discriminatory purpose. *United States v. Armstrong*, 517 U.S. 456, 465 (1996).

## I. PLAINTIFFS HAVE NOT ALLEGED FACTS THAT ESTABLISH A DISCRIMINATORY EFFECT

To establish there was a discriminatory effect, Plaintiffs "must show that people of another race, ethnicity, or religion violated the law and the law was not enforced against them." *Mohamed v. Walz*, No. 25-CV-02930, 2026 WL 636679, *7 (D. Minn. Mar. 6, 2026) (Frank, J.) (citing *Gilani*, 843 F.3d at 348). Plaintiffs and their comparator(s) must be similarly situated in all relevant respects. *Plaintiff A v. Park Hill Sch. Dist.*, 97 F.4th 586, 592 (8th Cir. 2024). Without this threshold showing, Plaintiffs do not have a viable Equal Protection claim. *In re Kemp*, 894 F.3d 900, 909 (8th Cir. 2018). Thus here, to survive this motion to dismiss, Plaintiffs must sufficiently allege that similarly situated CCAP providers owned by persons of non-East African descent were not targeted by Defendants Brown and

Clifford for investigation and sanctions. *See Mohamed*, 2026 WL 636679 at *17 (dismissing selective enforcement claim against law enforcement officer because "plaintiffs did not allege that similarly situated people of another race, ethnicity, or religion violated the law and that the law was not enforced against them"); *Blackwell v. Circle K*, No. 24-CV-3392, 2024 WL 4252867, *3 (D. Minn. Sept. 20, 2024) (Doty, J.) (granting motion to dismiss when plaintiff alleged no facts suggesting police treated similarly situated individuals differently because of their race).

Here, Plaintiffs have not plead *any* comparators. Instead, Plaintiffs appear to rely entirely upon their alleged similarity to the plaintiffs in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). (Doc. 55 ¶¶ 1-6.) In *Yick Wo*, the Supreme Court found a city permitting ordinance unconstitutional where all two hundred laundry businesses in San Francisco owned by Chinese people that applied for a permit were denied, while nearly all laundry businesses owned by people who were not Chinese were approved for a permit. *Yick Wo*, 118 U.S. at 373-74. But "[a]bsent a pattern as stark as that in . . . *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (constitutional challenge to zoning decision). Though Plaintiffs allege a "stark . . . pattern of DHS and DCYF officials targeting Somali child-care providers" for CCAP-related investigation, Plaintiffs plead no such allegation against any of the twelve defendants. (Doc. 55 ¶ 17.) Moreover, Plaintiffs concede that non-East African owned CCAP providers may have been subject to the same allegedly targeted special investigations and reassessments about which they complain. (Doc. 55 ¶¶ 14, 16, 17.)

Because Plaintiffs fail to sufficiently plead discriminatory effect, their Fourth Amended Complaint must be dismissed. *See Kemp*, 894 F.3d at 909.

## II. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD PERSONAL INVOLVEMENT

"Suits against officials in their individual capacity 'seek to impose personal liability upon a government official for actions he takes under color of state law." *Clay v. Conlee*, 815 F.2d 1164, 1169 (8th Cir. 1987) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). "The doctrine of *respondeat superior* does not apply to § 1983 actions." *Mohamed v. Walz*, No. 25-CV-2930, 2026 WL 2582914, *3 (D. Minn. Sept. 1, 2026). "Instead, a supervisor can be held individually liable for subordinate's constitutional violation only if a plaintiff shows that the supervisor knew about the conduct and facilitated it, approved it, condoned it, or turned a blind eye for fear of what they might see." *Id*. (citing *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994)). Negligence in failing to detect and prevent unconstitutional conduct by subordinates is insufficient to establish personal liability for a supervisory official under section 1983. *Id*.

Here, Plaintiffs fail to sufficiently plead personal involvement by Defendants Brown and Clifford. To wit, Plaintiffs allege that all twelve defendants together—without alleging where, when, how, or individualized roles for any individual defendant—"personally directed DCYF investigators" to conduct the targeted investigations and reevaluations at issue in their claim, reaction to inflammatory internet videos. (Doc. 55 ¶ 15.) Plaintiffs then allege that Defendant Clifford acted "on direction" from the other eleven defendants to issue the initial payment withhold notices they received. (*Id.* at ¶ 24.) Then, Plaintiffs allege that Defendants Clifford, John Doe 1-5 "and/or" Jane Doe 1-5 "mined earlier inquiries to provide

grist" for amended payment withhold notices which issued *after* DCYF concluded its investigation and issued the notices of administrative disqualification to each plaintiff. (*Id.* at ¶ 29; Garay Heelan Dec. Exs. 2, 3, 4, 5.) Plaintiffs' individualized allegations are sparse. Against Defendant Clifford, Plaintiffs allege only that he unreasonably denied their requests for reconsideration of the initial payment withhold notices. (Doc. 55 ¶ 29.) And against Defendant Brown, Plaintiffs allege that she held a December 29, 2026 press conference where she said DCYF had recently visited the daycare centers in the inflammatory internet video and not found evidence of fraud. (*Id.* at ¶¶ 8, 33.) Plaintiffs then impermissibly claim that Defendant Brown is individually liable for the conduct of her subordinates. (*Id.* at ¶ 34.); *Mohamed*, 2026 WL 2582914 at *3.

Moreover, Plaintiffs claim they were targeted for selective discriminatory enforcement in December 2025, following publication of an inflammatory internet video and political pressures. (Doc. 55 ¶¶ 12-14, 32.) But Plaintiffs concede that Hopkins was under DHS investigation three years earlier,[5] and that Cloud Academy was under DCYF investigation "nearly a year prior." (*Id.* at ¶ 29.) DCYF's statements in its amended notices of payment withhold and notices of disqualification bear out Plaintiffs' concessions (Garay Heelan Dec. Exs. 2, 3 (Hopkins under video surveillance from March 25-April 23, 2023), Exs. 5, 6 (Cloud Academy under video surveillance from January 10-March 19, 2026.) It is thus implausible that DCYF withheld payments, initiated disqualification sanctions, and overpayment recovery actions against Plaintiffs due to the media and political pressures alleged in the

[5] Plaintiffs do not plead that either Defendant Brown or Defendant Clifford were employed at DHS prior to their DCYF employment.

Fourth Amended Complaint. The Court should therefore hold that Plaintiffs' generic allegations against the twelve defendants (ten of whom are unidentified) insufficiently plead that Defendant Brown and Defendant Clifford were motivated by the East African descent of Plaintiffs' owners in taking those administrative actions.

Plaintiffs thus make only conclusory allegations that Defendants Brown and Clifford are liable for the selective discriminatory enforcement claim.

## III. Defendants Brown And Clifford Are Each Entitled To Qualified Immunity.

Even if Plaintiffs had sufficiently plead selective discriminatory enforcement and plausibly alleged personal involvement by Defendants Brown and Clifford in their individual capacities, those defendants are immune from Plaintiffs' claims for damages under the doctrine of qualified immunity. Qualified immunity shields government officials from liability for "civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Williams v. Bd. of Regents of Univ. of Minn.*, 763 N.W.2d 646, 654 (Minn. App. 2009); *see also*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (stating that a plaintiff must show that the officer violated a federal or constitutional right that was clearly established at the time of the violation). To determine whether qualified immunity applies, courts first consider whether the plaintiff has alleged facts showing the defendant violation of a constitutional right and second, whether this right was "clearly established" at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "By focusing on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, the test for qualified immunity is intended both to avoid excessively

disrupting government functioning and to deter unlawful conduct." *Simmons v. Fabian*, 743 N.W.2d 281, 286 (Minn. App. 2007) (quotation omitted). As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In addition, "the clearly established law must be 'particularized' to the facts of the case" and may not be defined at a high level of generality. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is the plaintiff's burden to produce caselaw in which "the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability." *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1994); *Wesby*, 138 S. Ct. at 590 (we have stressed the need to "identify a case where an officer acting under similar circumstances … was held to have violated [federal law]" (citation omitted)).

Here, Plaintiffs cannot point to any such case that a state officer acting under similar circumstances was held to have violated a plaintiff's rights. Specifically, Defendants Brown and Clifford could not have known that their alleged actions to direct investigators to continue investigating CCAP providers already under investigation would violate a provider's Equal Protection rights. Further, neither Defendant Brown nor Defendant Clifford could have known that acting on already-gathered evidence of CCAP violations—including determinations that Hopkins overbilled CCAP by $62,247.20 overpayment, and that Cloud Academy overbilled by $23,815.80 overpayment—would further violate the provider's Equal Protection rights.

The Court should therefore conclude that Villella has qualified immunity from suit for damages under section 1983.

## CONCLUSION

Defendants Brown and Clifford respectfully request the Court to dismiss the Fourth Amended Complaint against them with prejudice.

Dated: October 15, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

**s/ James P. Garay Heelan**
JAMES P. GARAY HEELAN
Assistant Attorney General
Atty. Reg. No. 0506135

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 300-7894 (Voice)
(651) 282-5832 (Fax)
James.GarayHeelan@ag.state.mn.us

*Attorney for Defendants*

|#6461420-v1